<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2

 3   ------------------------------------------------------------
                                  )
     United States of America,     )   File No. 16-CR-334
 4                                 )              (JNE/KMM)
              Plaintiff,           )
 5                                 )
     vs.                           )   Minneapolis, Minnesota
 6                                 )   June 23, 2017
     Paul R. Hansmeier,            )   9:00 a.m.
 7                                 )
              Defendant.           )
 8   ------------------------------------------------------------

 9
                        BEFORE THE HONORABLE
10                     KATHERINE M. MENENDEZ
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
11                      (MOTION HEARING)

12   APPEARANCES
       For the Plaintiff:         UNITED STATES ATTORNEY'S OFFICE
13                                Benjamin F. Langner, AUSA
                                  David MacLaughlin, AUSA
14                                600 U.S. Courthouse
                                  300 South Fourth Street
15                                Minneapolis, MN 55415

16     For the Defendant:         FEDERAL DEFENDER'S OFFICE
                                  Andrew H. Mohring, ESQ.
17                                Manvir K. Atwal
                                  U.S. Courthouse, Room 107
18                                300 South Fourth Street
                                  Minneapolis, MN 55415
19
       Court Reporter:            STACI A. HEICHERT,
20                                RDR, CRR, CRC
                                  1005 U.S. Courthouse
21                                300 South Fourth Street
                                  Minneapolis, Minnesota 55415

22

23

24        Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25
</pre>

1          **P R O C E E D I N G S**

2                **IN OPEN COURT**

3          THE COURT:  All right.  Good morning, everybody.

4    We are here to talk about pre-trial motions in United States

5    versus Paul Hansmeier.  And why don't -- we are obviously

6    making a record.  Why don't we start by having counsel note

7    their appearances, first, counsel for the government.

8          MR. LANGNER:  Good morning, Your Honor.  Ben

9    Langner and David MacLaughlin on behalf of the United

10   States.

11         THE COURT:  Excellent.

12         MR. MACLAUGHLIN:  Good morning.

13         THE COURT:  Welcome to both of you.  And next,

14   counsel for Mr. Hansmeier.

15         MR. MOHRING:  Andrew Mohring and Manny Atwal

16   representing Mr. Hansmeier who is here with us in court as

17   well.

18         THE COURT:  Thank you.  Thanks to both of you.

19   And welcome, Mr. Hansmeier.  How are you doing?

20         THE DEFENDANT:  Very well.  Thank you, Judge.

21         THE COURT:  Okay.  So let's start with the easy

22   stuff, let's talk through the motions that the defense has

23   filed and the government has filed that don't require as

24   much debate and thinking.  And Mr. Mohring, are you going to

25   be speaking first on behalf of Mr. Hansmeier?

1          MR. MOHRING:  Yes, Your Honor, I am.

2          THE COURT:  Okay.  So let me ask a question I

3    guess to both counsel that might help me have backdrop for

4    the couple of discovery issues that there's a little bit of

5    debate about.  Most of these are completely

6    noncontroversial.  I think both sides understand *Brady* and

7    its ongoing requirements, and I don't expect any problems

8    there.

9          Are you, Mr. Langner, taking an open file approach

10   to discovery or something different in this case?

11         MR. LANGNER:  Your Honor, we've essentially turned

12   over or made available everything we have with the exception

13   of Jencks materials which we anticipate discussing with

14   defense and turning over well in advance of trial.

15         THE COURT:  Great.  Okay.  So when we're talking

16   about the timing of the -- I guess I sort of did a head fake

17   calling Mr. Mohring to the podium and then talking to you.

18   Sorry about that.

19         MR. LANGNER:  That's okay.

20         THE COURT:  But when we're talking about the

21   timing of both expert disclosure and 404(b), is it fair to

22   say with respect to 404(b) that you've already turned over

23   the underlying evidence but that what you are debating about

24   is when you need to make the formal 404(b) notice?

25         MR. LANGNER:  Exactly, Your Honor.  There's

1    only -- I'm only aware of two categories of events or

2    activities that would be considered 404(b), one being the

3    defendant's bankruptcy proceedings which obviously he's

4    aware of and we've turned over materials to the extent that

5    we have them, the other being his activities with the ADA

6    lawsuits that he's filing.  I'm not sure that we will seek

7    to introduce either of those in relation to the wire fraud

8    and mail fraud scheme but certainly the defense is well

9    aware of those.  We've turned over whatever materials we

10   have.  We have not, obviously, thought through specifically

11   how we would introduce those if we were to introduce those

12   at trial, though.

13            THE COURT:  Okay.  Thank you.  Mr. Mohring, what

14   are your concerns with 14 days with respect to the 404(b)?

15            MR. MOHRING:  Well, Your Honor, the -- the notice

16   serves a legitimate purpose in the process.  I mean, there

17   has been a very extensive collection of discovery materials

18   disclosed already and the promises of even more to come.

19   As -- as reflected in discovery declaration that I filed

20   along with the pre-trial motions, there are no obvious Rule

21   16 type omissions from the discovery, at least as we can

22   tell, although it's difficult to be -- to know what's in the

23   black box that is the government's collection of records.

24   But the fact that we have a bunch of stuff that the

25   government may or may not seek to introduce through Rule

1    404(b), that's a step in the right direction, but without

2    the notice, we don't know what we're shooting at.  We don't

3    know what we're shooting at from a standpoint of relevance

4    and relevance objections.  We don't know what we're shooting

5    at from a standpoint of admissibility under 404 itself.

6         We certainly aren't in a position, without the

7    notice, to litigate the balance of prejudice versus

8    probative value of the material.  And so getting a notice

9    14 days before trial, in a situation where at least the

10   existing order has an -- a day -- a deadline I think ten

11   days before trial for any and all pre-trial motions, motions

12   in limine, jury instructions, voir dire -- proposed voir

13   dire questions, gives us effectively three days to flesh out

14   and litigate all of those questions for 404.  And these are

15   -- this same set of considerations apply as to the expert

16   notice as well but so --

17        THE COURT:  Okay.  I want to talk about expert in

18   just a moment.

19        MR. MOHRING:  Fair enough.

20        THE COURT:  Mr. Langner, is it your --

21        MR. MOHRING:  One last point if I may, Your Honor.

22        THE COURT:  Oh, certainly.

23        MR. MOHRING:  I apologize for interrupting, but

24   the allegations in the indictment focus on a time period

25   between 2011 and 2014 so kind of in the mix of

1     considerations about the fairness of a burden -- of a -- or

2     the burden of a deadline much further in advance of trial

3     than just 14 days is that the government has had this case

4     and had this investigation for a long time and so this is

5     not a situation where we are responding quickly to events

6     that very recently happened with a person in custody and the

7     pressures of the Speedy Trial Act bearing down so.

8               THE COURT:  Okay.  Thank you.  Mr. Langner, what

9     can you tell me about the likelihood, and I don't expect you

10    to, you know, commit or pinkie swear, but the likelihood of

11    expert testimony in this matter?

12              MR. LANGNER:  I'm not -- I have no present

13    intention of using an expert in this case.

14              THE COURT:  Okay.

15              MR. LANGNER:  So if that happens, it would be

16    based on something that develops between now and trial.

17              THE COURT:  Okay.

18              MR. LANGNER:  I could see us perhaps calling

19    somebody to testify about bank records but that would really

20    not be expert testimony.

21              THE COURT:  That would be foundational.

22              MR. LANGNER:  Right.  So I don't think we will be

23    calling an expert, Your Honor.

24              THE COURT:  Okay.  And Mr. Mohring, what are your

25    thoughts about the likelihood of expert testimony in this

1    matter?

2            MR. MOHRING:  You know, the real concern that we

3    have is are they going to call an expert such that we would

4    need or it would be prudent for us to have expert testimony

5    to try to rebut it, so as things stand, I'm not aware of

6    anything to --

7            THE COURT:  Okay.  So I'm sensing sort of a mutual

8    if he goes first, I will kind of approach to expert

9    likelihood.

10           MR. MOHRING:  I don't know about mutual but --

11           THE COURT:  Okay.  Good.  So I'm --

12           MR. MOHRING:  But and in light of -- in light of

13   which a request of notice, setting a deadline for notice

14   60 days before trial, which is our request, ought not be a

15   problem based on what I'm hearing.

16           THE COURT:  And you've indicated 14 days for

17   experts as well?

18           MR. LANGNER:  That's what I've indicated.  We

19   could certainly do, you know, 30 days.  I think that would

20   be reasonable.

21           THE COURT:  Okay.

22           MR. LANGNER:  To the extent that we are going to

23   have something, but I mean, 60 days is just I think far, far

24   in advance of trial for an unlikely event at this point.

25           THE COURT:  Okay.  Anything else that you would

1      like me to hear with respect to all motions, aside from the

2      motion to dismiss or the motion for a Bill of Particulars?

3                  MR. LANGNER:  Not from the government, Your Honor.

4                  THE COURT:  Okay.

5                  MR. MOHRING:  Your Honor, just so on Rule 16, I've

6      already indicated there are no obvious omissions.  The

7      process I think calls on us to file a Rule 16 motion in some

8      cases.

9                  THE COURT:  Sure.

10                 MR. MOHRING:  And so we did here.  I regret the

11     late submission and I apologize for the late submission of a

12     *Brady* motion.  We did offer that.  There's a -- an *Agers*

13     list that is fairly conventional, but there are a couple of

14     points right at the end.  We are seeking as *Brady*

15     information, but also in context with the Bill of

16     Particulars, about which perhaps more in a minute,

17     information about the individuals that the government refers

18     to as victims or that they conceive of as victims in this

19     case, seeking information about whether the people that they

20     believe are victims downloaded materials that are

21     potentially subject to copyright protection, seeking

22     information about the nature and the extent of the victims'

23     downloading activities, and information and any authority

24     that those -- the government's claims or that the claims in

25     the civil lawsuits are vitiated by the defendant allegedly

1   uploading the materials that the victims, if indeed these

2   are the victims, downloaded.

3           THE COURT:  You think that the -- that *Brady*

4   requires the government to articulate a theory to you?

5           MR. MOHRING:  I think that *Brady* requires the

6   government to offer information.  And it's not just *Brady*.

7   I mean, we have a -- we have a context in this case in which

8   the indictment is a sweeping and sprawling document.  It

9   speaks in vivid but sometimes imprecise language.  There

10  are -- there are intimations of a number of different

11  potential types of victims, and so in that -- so the *Brady*

12  request and the motion for a Bill of Particulars also exist

13  in that context.  So some of the -- some of the -- I

14  recognize some of the more expansive nature of the *Brady*

15  request and of the information that we're seeking in the

16  Bill of Particulars.  This is more expansive than what we

17  usually ask for as *Brady*.  And Bills of Particulars happen

18  but not everyday.

19          THE COURT:  I have not seen one.

20          MR. MOHRING:  But I would say -- but, you know,

21  we're -- that -- the need for that type of information and

22  the appropriateness of those requests, both as *Brady* and in

23  the context of setting the Bill of Particulars, is driven by

24  the indictment itself, and that -- the government chose to

25  write what they wrote.

1      THE COURT:  Okay.  Thank you.  I think you can be

2  seated, unless there's anything else on the non-dispositive

3  motions, Mr. Mohring.

4      MR. MOHRING:  Just to say this, Your Honor, the

5  government did file I believe a motion for reciprocal

6  discovery, and we don't object to that.

7      THE COURT:  Okay.  Great.  Thank you.

8  Mr. Langner, I'm going to save the conversation for the Bill

9  of Particulars until after our conversation about the motion

10  to dismiss.  Is there anything you'd like to say about the

11  *Brady* motion?

12      MR. LANGNER:  I guess I'll -- there was a little

13  bit of joint discussion there --

14      THE COURT:  Yeah.

15      MR. LANGNER:  -- about Bill of Particulars and

16  *Brady*.  To the extent that we have information about victims

17  or whether they uploaded materials, we, of course, would

18  disclose that.

19      THE COURT:  Okay.

20      MR. LANGNER:  I think what, in large part, the

21  electronic evidence of that is not in our possession, if it

22  even exists.  To the extent that we've inquired about that

23  or we have information from the victims about that, it would

24  be in the Jencks materials which we, of course, will turn

25  over.

1              THE COURT:  Okay.  Why don't I go ahead and rule

2      on the non-dispositive motions, and I'll save the

3      conversation about the Bill of Particulars for after our

4      conversation about the motion to dismiss.  Both discovery

5      motions, Docket Nos. 33, which is the government's motion

6      for reciprocal discovery, and Docket No. 51, which is the

7      defendant's motion for discovery and inspection, will be

8      granted to the extent provided by the rules.  And this will

9      be codified in a brief order after the hearing.  I'm not

10     sure if "codified" is the right word.  This will be captured

11     in a brief order after the hearing.

12             The -- I'm going to agree in part with the defense

13     as to motions at Docket 52 and 53.  30 days seems like an

14     appropriate balance for both expert testimony and 404(b) in

15     this case.  Mr. Langner, I appreciate that you have already

16     provided substantial information related to possible 404(b)

17     issues.  My concern is both of the areas that you mentioned

18     are so sweeping in scope or potentially sweeping in scope,

19     completely separate but could be large scale allegations,

20     that it will require some time for the defense to prepare a

21     motion on whether that's an appropriate use of 404(b) or not

22     so 30 days does that.  I think 14 is cutting it too close.

23             I'm going to decline the invitation for 60 days of

24     expert testimony.  I think 30 days achieves that goal as

25     well.  But I certainly encourage both sides, and I think it

1    sounds like it will start with you all, but if you change

2    your mind at some point and are thinking about hiring an

3    expert, letting the defense know that as early as possible,

4    aside from this ruling, will allow them to consider hiring

5    their own expert as well even before the formal requirement

6    of the full expert report is due.

7            I am going to grant the *Brady* motion to the extent

8    required by *Brady* and *Giglio* and their progeny.  I am not

9    going to opine about whether Mr. Mohring's request for

10   specific types of information is governed by *Brady* or not.

11   I do note that *Brady* places requirements on the government

12   to look beyond just its own files for information but mostly

13   into the files of law enforcement and not necessarily to go

14   looking for third-party discovery that might be exculpatory

15   for the defendant.  So I will grant that motion to the

16   extent required by *Brady*, *Giglio* and their progeny.  And

17   are -- if disputes emerge about whether that's being

18   complied with, I'm happy to consider those down the road or

19   I'm sure Judge Ericksen would do so as well.

20           Let us turn to the motion to dismiss.  And

21   Mr. Mohring or Ms. Atwal, whoever is going to address this,

22   you get to go first.

23           MR. MOHRING:  Thank you, Your Honor.  Well, Your

24   Honor, for the reasons that have been articulated at

25   considerable length, I recognize, in our pleading.

1          THE COURT:  You said it.

2          MR. MOHRING:  The indictment in this case fails to

3    say a criminal cause of action and the charges should be

4    prevented from going to trial.  They should indeed be

5    dismissed.

6          THE COURT:  Can I clarify which type of motion to

7    dismiss we have?  And I think it's clear, but I just want to

8    make sure.

9          MR. MOHRING:  Well, we're relying on Rule 12.

10         THE COURT:  Yeah.

11         MR. MOHRING:  And I believe Rule 12, both (b)(3)

12   and (b)(6).

13         THE COURT:  So is it your argument that as

14   that -- that the indictment sets forth the elements of the

15   offense, sets forth sufficient facts but that those facts

16   cannot constitute a crime as a matter of law?

17         MR. MOHRING:  That's one argument.

18         THE COURT:  Okay.

19         MR. MOHRING:  Well, actually, no, I -- I would

20   parse that slightly differently.  We think that the

21   indictment itself is legally deficient because the facts

22   outlined in the indictment do not constitute the crime of

23   fraud that they are -- and do not meet the requirements of

24   the statute itself.  But we also believe that the facts as

25   alleged do not meet the elements of fraud, do not

1    substantiate those.  So I mean, the -- they do -- they do

2    pay lip service to the elements of fraud.  They do say that

3    there was a scheme.  They do say, I believe, that there's a

4    claim of materiality.  But the actual facts do not

5    substantiate them.

6         So if I may, I -- we have identified a number of

7    independent bases, a number of independent defects in the

8    indictment, any one of which, each of which, is sufficient

9    to support dismissal of the charges that we're focussing on.

10   And I want to be clear about a couple of things.  We're

11   focussing on Counts 1 through 17, so we're talking about the

12   fraud charges, we're talking about the related money

13   laundering charges, and we're talking about the conspiracies

14   that relate to each of those set of allegations.

15   That's -- that's -- those are the charges that the motion

16   focuses on.

17        And I guess also to be clear at the outset that we

18   understand and don't dispute that at this -- that the

19   evaluation and the lens through which the Court is directed

20   to look in considering these questions is assuming that

21   everything in the indictment is absolutely true and

22   construing and characterizing what is in the indictment in

23   the manner most favorable to the government.  Obviously in

24   talking about these things, we don't concede the truth of

25   any of that.

1          THE COURT:  Right.

2          MR. MOHRING:  But that is the proper standard --

3          THE COURT:  But your belief --

4          MR. MOHRING:  -- and perspective here.

5          THE COURT:  -- that they might fail to prove X or

6   Y allegation isn't the basis of your motion.

7          MR. MOHRING:  Correct.  Right.  So the

8   government -- at the heart of the government's claim is a

9   claim that Paul Hansmeier and other defendants, named and

10  not named, engaged in baseless infringement lawsuits, civil

11  lawsuits, and that in so doing they committed the federal

12  crime of fraud.

13         THE COURT:  Let's hit pause there.

14         MR. MOHRING:  Mm-hmm.

15         THE COURT:  The word "scheme" is sort of central

16  in the fraud statute, and it can be charged two different

17  ways, I think here they're trying to charge both ways, I'm

18  going to ask Mr. Langner about that, but it is more than

19  simply -- the allegations in the indictment are far more

20  than simply engaged in certain meritless civil litigation.

21  It is several other parts that include suborning perjury,

22  committing perjury, generating false evidence, creating sham

23  entities to conceal true ownership, and hiding critical

24  facts like the fact of uploading to BitTorrent, as well as a

25  set of claims of a completely -- allegedly completely

1    fabricated nature, the hacking, what I'm going to refer to,

2    you know, for convenience sakes is the hacking claims,

3    inventing an allegation that you're trying to seek -- that

4    Mr. Hansmeier was trying to seek early discovery to ferret

5    out unlawful hacking of his clients' computer systems when

6    that was untrue.  So this is beyond, and I'm going to push

7    back a little bit, beyond the idea that it is merely filing

8    a specious set of litigation, right?

9           MR. MOHRING:  And yet without that litigation, I

10   don't think we would be here and I don't think that the

11   indictment would stand, so the -- what they call in various

12   ways specious or baseless or sham or frivolous or

13   fraudulent, the indictment uses a number of terms that I

14   searched for definitions in Title 18 in vain,

15   that -- that -- the civil litigation that they characterize

16   in those various ways is central to the scheme that they

17   allege, is central to the charges so.

18          THE COURT:  And are you saying that because of

19   that it is immune from prosecution?  Is it your position

20   that a scheme that has a heart in civil litigation cannot be

21   the subject of a mail fraud or wire fraud or conspiracy

22   prosecution?

23          MR. MOHRING:  Absent something more which is not

24   present in this set of allegations, yes.

25          THE COURT:  And the something -- okay.  So I want

1    to talk about that in a minute.  But in your opinion,

2    the -- the perjury is not something more, it is part of the

3    civil scheme, civil litigation scheme?

4              MR. MOHRING:  Right.

5              THE COURT:  And in your opinion, the --

6              MR. MOHRING:  Understanding that --

7              THE COURT:  -- shell --

8              MR. MOHRING:  -- we're talking about the perjury

9    charges in the indictment.  We're not --

10             THE COURT:  I'm talking about the perjury

11   charges --

12             MR. MOHRING:  Yes.

13             THE COURT:  -- alleged in the conspiracy count --

14             MR. MOHRING:  Yeah.

15             THE COURT:  -- not the Count 18.

16             MR. MOHRING:  Yes.

17             THE COURT:  That is not separate, that's not

18   extrinsic to the civil litigation scheme in a way that makes

19   your statement untrue.

20             MR. MOHRING:  Correct.

21             THE COURT:  Okay.  So I want to flesh that out.

22   Let's imagine that there is a civil litigation that is

23   fraudulent in its entirety, so let's pretend that a lawyer

24   chooses an area of the law to pick on unsophisticated

25   victims who are unlikely to have counsel and invent a

1    contract, going door to door and saying I actually purchased

2    ten years ago the mineral rights under your home and I am

3    going to bring in a drilling company to drill under your

4    home and the only way you can get around it is by paying me

5    money and here's a copy of the complaint that I'm going to

6    file and I have a lawyer or am a lawyer and all of that is

7    untrue and that could never be the subject of a mail fraud

8    or a -- and then let's say there's mailing or wiring that

9    gets us the hook, that could never be the subject of a

10   criminal prosecution in your mind?

11            MR. MOHRING:  You know, I struggle with an answer

12   to the question because the hypothetical is so far from the

13   circumstances of this case.  It is not at all clear that the

14   litigation in this case was itself fraudulent.

15            THE COURT:  I'm trying to test --

16            MR. MOHRING:  And so --

17            THE COURT:  -- your dominant theory.

18            MR. MOHRING:  Right.

19            THE COURT:  Which is not whether this litigation

20   was fraudulent, because they say it was and we're struck

21   with that, right, for today.  You might not be stuck with

22   that at trial, but you are stuck with them claiming that he

23   had no intention of pursuing the litigation, and I am

24   interested in the copyright issue, but for understanding the

25   scope of your position, are you saying that no matter how

1    extreme something that lives entirely in civil litigation

2    cannot be the subject of a criminal prosecution?

3              MR. MOHRING:  You know, I'm not sure that I'm

4    prepared to go quite that far, but certainly, certainly, it

5    would have to be very extreme and much more extreme than

6    anything that the indictment spells out, alleges here.  I

7    would quibble with at least with one thing I heard you say.

8    I mean, we are stuck with the facts alleged in the

9    indictment.  We are not stuck with the characterization --

10             THE COURT:  No, that's true.

11             MR. MOHRING:  -- of those facts, the legal

12   characterization of those facts that the indictment purports

13   to make and so the indictment says fraud, that doesn't mean

14   that they've pled fraud, that doesn't mean that the facts

15   support fraud.

16             THE COURT:  So I guess the first --

17             MR. MOHRING:  And that doesn't mean that the case

18   law that very seriously -- imposes very serious limits, the

19   Eighth Circuit case law included in this case.

20             THE COURT:  Let's talk about the case law for the

21   proposition that it could have to be unusually extreme to

22   constitute a criminal fraud violation.  Your best support

23   for that is *I.S. Joseph*?

24             MR. MOHRING:  Yes.

25             THE COURT:  *I.S. Joseph*.  So --

1          MR. MOHRING:  And as discussed and applied in

2     other cases but *I.S. Joseph* is an Eighth Circuit case.

3     *Pendergraft* which discusses and extends the application of

4     the *Joseph* holding I think is an Eleventh Circuit decision.

5          THE COURT:  But *Pendergraft* is really cabined by

6     *Lee*, wouldn't you agree?  I mean, which said all of the

7     musings about civil litigation being immune from prosecution

8     were basically dicta and the critical part of *Pendergraft*

9     was that nobody believed the affidavits.  I think --

10         MR. MOHRING:  Yeah.

11         THE COURT:  -- *Pendergraft* has some

12    vulnerabilities.  I'm -- I'm more mindful that *I.S. Joseph*

13    is an Eighth Circuit case.

14         MR. MOHRING:  Right.

15         THE COURT:  How central to the rationale of *I.S.*

16    *Joseph* do you think the facts of it being an extortion case

17    and, frankly, a RICO case where the court says the real

18    issue is that two threats to commit civil litigation cannot

19    constitute a, oh, I'm trying to find the term they used,

20    it's a RICO term, an enterprise.

21         MR. MOHRING:  I think that the -- I think that

22    the -- the *Joseph* holding extends beyond RICO, I mean, but

23    even if -- even if you view that otherwise, and I mean, so

24    the *Joseph* -- to play that out, the *Joseph* court says that

25    threatening litigation, even threatening baseless

1    litigation, is not criminal, not criminal within the context

2    of a RICO -- a criminal RICO prosecution but not -- or

3    rather a civil RICO prosecution but not criminal.  Even

4    though if you -- if you limit, as the government suggests

5    that you should, the import of that case to a setting of

6    extortion, suggestions of extortion, albeit imprecisely,

7    again, the indictment is a sweeping and colorful document,

8    but suggestions of extortion as a central component of the

9    fraud scheme, of the scheme that the indictment alleges,

10   appear throughout the indictment.  So even if it's just --

11              THE COURT:  But the difference is they don't have

12   to prove extortion in this case and they did have to prove

13   extortion the way the RICO case was pled, right?

14              MR. MOHRING:  I think that's true.

15              THE COURT:  They might be using it as icing or

16   hyperbole or, you know, inflammatory language, we can talk

17   about why the word extortion is in the indictment, but they

18   don't have to prove extortion to prevail in this case,

19   whereas in *I.S. Joseph* they do.

20              MR. MOHRING:  I think that's -- that's correct.

21   That's right.

22              THE COURT:  How has *I.S. Joseph* been interpreted

23   subsequently by the Eighth Circuit or does have it any

24   continuing life in the cases?  I couldn't find much of one.

25              MR. MOHRING:  I couldn't either.  And I realize it

1     was a I think a 1984 case, but we rely on cases that old and

2     older all the time.

3             THE COURT:  Yeah.

4             MR. MOHRING:  And it certainly it hasn't been

5     refuted by the Eighth Circuit.  And I think the absence of

6     case law on this point in the Eighth Circuit and the

7     relative absence of it anywhere is an indication of how far

8     out -- how far beyond the norm the charges in this

9     indictment are --

10            THE COURT:  Let me ask this.

11            MR. MOHRING:  -- how far -- how extreme the

12    government's -- and even radical the government's invitation

13    to you and to this Court to criminalize civil litigation in

14    a manner that they have asked you to do.

15            THE COURT:  Let's imagine that this case was

16    entirely about the requests for early discovery and the

17    government somewhat alleges that there was no intention to

18    pursue full-on litigation, they say that in the indictment

19    that there was -- in fact I think they use the term there

20    was no intent to actually bring the lawsuit, it was all

21    about discovery, civil discovery, early civil discovery.

22            MR. MOHRING:  The facts don't -- do not support

23    that, but I understand.

24            THE COURT:  And well, that's a problem for another

25    day.

1          MR. MOHRING:  Right.

2          THE COURT:  Or an opportunity for another day if

3     you're the defense, I guess.  But is it -- does it matter

4     that a district judge or a magistrate judge being asked to

5     use the somewhat unusual tool of early discovery, it's an

6     exception rather than the rule, I -- it is not often used

7     and it -- there has to be particular showings to make it

8     happen, would not have granted early discovery had they

9     known about the uploading?

10         MR. MOHRING:  Is the Court's question does that

11    matter?

12         THE COURT:  Yeah.  Doesn't that create a sort of

13    significant unique exception, something that makes this case

14    different from merely threatening to sue someone?

15         MR. MOHRING:  I -- that's hard for me to say.

16         THE COURT:  I mean, lying to a judge to get them

17    to issue -- if that's -- if that is what is here, or, let's

18    -- making a material omission when you have a duty to

19    disclose, which I want to talk about in a minute, making a

20    material omission when you have a duty to disclose a fact

21    that, if it were disclosed, would not have led to the

22    issuance of early discovery, could that constitute a fraud?

23         MR. MOHRING:  Under a materiality standard?

24         THE COURT:  Mm-hmm.

25         MR. MOHRING:  So if it might have had the possible

1    impact on the judge's decision?

2            THE COURT:  And I think the government alleges

3    that it would have had that impact.

4            MR. MOHRING:  That's a hypothetical but --

5            THE COURT:  Okay.  Let's say that's all that was

6    alleged here is seeking early discovery, knowing that a

7    judge would not issue the early discovery if they had known

8    a material fact, having a duty to disclose that material

9    fact and not doing so, could that constitute a wire or a

10   mail fraud, depending on how you filed your motion?

11           MR. MOHRING:  I suppose in theory it could, but

12   that's not what we have here.

13           THE COURT:  Okay.  How is that not what we

14   have -- how is that not one part of what we have here?

15           MR. MOHRING:  Okay.  So under cases that we've

16   offered to the court, accepting for purposes of present

17   argument --

18           THE COURT:  Absolutely.

19           MR. MOHRING:  -- the government's allegations as

20   true, so the facts that we're talking about are the

21   government's allegation that Paul Hansmeier and others,

22   known and unknown, engineered the uploading of material as

23   to which they made a claim of copyright protection --

24           THE COURT:  Right.

25           MR. MOHRING:  -- to a site from which it was

1    downloaded and so what we're talking about then for this

2    specific set of questions is the -- the alleged omission of

3    that information from the civil litigation that they've

4    filed, including and preceding the request for early

5    discovery.  There is abundant support, and we've highlighted

6    it to the Court in writing, for the proposition that there

7    is no obligation on the part of a civil plaintiff to allege

8    or offer information that would support an affirmative

9    defense on the part of the defendants.

10              THE COURT:  And that's not what -- that's why I'm

11   specifically not asking that.  I'm not talking about the

12   failure in a subsequent complaint to flag a possible

13   defense.  I'm talking narrowly about utilizing the Court's

14   early discovery and not revealing a fact that, assume for a

15   moment, and this is a fact at trial, would be material to a

16   magistrate judge.  For instance, as a magistrate judge, I

17   would find it important, but I recognize that my subjective

18   thoughts are not what's relevant here, to know that

19   uploading had happened when I was confronted with a request

20   to use the somewhat exceptional power of early discovery.

21   So your points about not flagging a defense I'm utterly

22   persuaded by and I'm going to spend some time talking to the

23   government about that.  I don't mean as to a final

24   conclusion, I mean they present really good questions.  This

25   is a different question that I'm asking, but this is a part

1    of the scheme.

2          MR. MOHRING:  I would, so, again, not -- I'm not

3    sure that that -- this is where we are, but I would -- to

4    answer your question as directly as I'm able, I would

5    suggest that to base a criminal fraud prosecution on the

6    omission of a material -- a material piece of information in

7    an application for unusual discovery authority ought not

8    form the bases of a criminal prosecution.

9          THE COURT:  Cannot?  Because ought isn't so much

10   vested in the authority of the magistrate judge but can is

11   our question today.

12         MR. MOHRING:  I can say I cannot imagine a set of

13   facts in which the omission of a material -- of material

14   information in a discovery application in a civil lawsuit

15   would support a -- a criminal prosecution.  Sanctions,

16   dismissal, other -- other, you know, referral to bar

17   disciplinary authorities, all of which have happened, as the

18   government has demonstrated at considerable length, in this

19   set of circumstances, sure, but a criminal prosecution and

20   the -- the criminalization of that type of conduct?  I -- I

21   can't imagine something that would be so extreme, fitting

22   within the constructs of the Court's hypothetical, that that

23   would support a criminal prosecution.  And I would think

24   that even the attempt to do something like that would and

25   should be met with serious reservation and hesitation and

1      restraint.

2                THE COURT:  Okay.  I know I'm jumping around a

3      lot.

4                MR. MOHRING:  That's okay.

5                THE COURT:  I've just got a couple of other

6      questions --

7                MR. MOHRING:  You get to.

8                THE COURT: -- from your memorandum.  Is it your

9      position that an omission, aside from the civil litigation

10     context of the omission, that an omission, combined with a

11     duty to disclose, can't constitute fraud or are you not

12     saying that?  I don't want to push back on arguments you're

13     not making.

14               MR. MOHRING:  So now we're shifting to the --

15               THE COURT:  Theoretical idea of fraud as opposed

16     to in this particular context, can it be an omission

17     combined with a duty to disclose?

18               MR. MOHRING:  But now we're bringing in the rules

19     of professional responsibility and the duty of candor to the

20     Court, that sort of --

21               THE COURT:  Well, we can talk more generally about

22     whether there's a duty to disclose in this case and where

23     that comes from, but I'm just -- I'm more in black letter

24     law of fraudness, normally it's a false statement, a

25     material false statement or misrepresentation, or a set of

1    material false statements and misrepresentations, but

2    there's also I think some case law that supports the idea

3    that it could just -- maybe not just as easily but could

4    also be an omission that's material if there were a duty

5    created somewhere, whether it's on a form or from a

6    fiduciary duty, it -- that can constitute a fraud.  Is that

7    true?

8              MR. MOHRING:  In the presence of harm to property

9    and --

10              THE COURT:  And the other elements.

11              MR. MOHRING:  -- the other requirements and all of

12    that, I think that -- I'm not aware of authority that would

13    say otherwise.

14              THE COURT:  So are you arguing that there isn't a

15    duty here that could be elevated to create that reality?  I

16    mean, part of your brief focussed on the idea that there's a

17    flaw in importing the duty from such sources as the rules of

18    professional responsibility or district court rules or

19    wherever from whence it comes, is it your position that

20    those can't give rise legally to the duty?

21              MR. MOHRING:  It's certainly our position that the

22    proper forum for those concerns is not a criminal

23    prosecution but rather the normal course of civil litigation

24    and the operations of the attorney disciplinary authority

25    that is given the authority to enforce the rules that the

 1      government is relying on.  I realize that's not quite --

 2                THE COURT:  No, that's --

 3                MR. MOHRING:  -- a direct answer to the Court's

 4      question but fair question, a legitimate concern, but the

 5      wrong forum and the wrong document bringing those concerns

 6      and the fact that there has been active and vigorous and

 7      pointed activity on the part of attorney disciplinary

 8      authorities against this man shows that that's --

 9                THE COURT:  So another hint that I got from your

10      memorandum but that was less emphasized in your reply, and I

11      don't want to, you know, say ah-ha, you've waived it,

12      because you were very explicit in your reply that you

13      weren't purporting to restate all of the facts, but it could

14      also be that, in light of the government's clarifications

15      that came in their response, you didn't pursue this, so I

16      want to know which it is to decide how much ink I spend

17      working on it.  Is it your position that as a matter of law,

18      a lie to one party leading to retrieving property that

19      qualifies from another party cannot constitute a violation

20      of these statutes?

21                MR. MOHRING:  So I appreciate your zeroing in on

22      that.  I saw the government's -- I mean, that's -- that's an

23      open question as to which there's a significant amount of

24      dispute among the circuits.  The government has cited an

25      Eighth Circuit case saying that you don't need that kind of

1    unitary, that --

2         THE COURT:  Convergence is the word I saw in one

3    of the cases.

4         MR. MOHRING:  Right.  In the apparently in the

5    Eighth Circuit that is not a requirement.

6         THE COURT:  And so you no longer are relying on

7    that as a basis to undermine the validity of this

8    indictment?

9         MR. MOHRING:  We would certainly want to retain an

10   objection to that in the event that this case goes up

11   because it does appear that there is a significant split

12   among the circuits on exactly that point but --

13        THE COURT:  Okay.  So you agree maybe that my

14   hands might be tied on that question.

15        MR. MOHRING:  On that specific question, it does

16   appear so.

17        THE COURT:  Now but that you persist in an

18   argument that that is an incorrect application of the fraud

19   word.

20        MR. MOHRING:  Yes.

21        THE COURT:  Okay.  And your best authority, aside

22   from policy arguments, which while I might find persuasive

23   aren't usually mine to make, your best authority for the

24   idea that the civil litigation arena, no matter -- sort of

25   no matter how egregious that misconduct in the arena of

1    litigation is not properly the subject of a fraud

2    prosecution and the heavy criminal sanctions that go with

3    it, your best authority for those are *I.S. Joseph* and

4    *Pendergraft*?

5           MR. MOHRING:  Well, also *Wolfchild*, Your Honor,

6    which is a 19 -- or 2016 decision from the Eighth Circuit.

7           THE COURT:  Can you point to me, to the page that

8    that is in your brief just so I can find my notes.

9           MR. MOHRING:  I think we were focussed on page 770

10   to 771 in *Wolfchild*.  Oh, you're talking about the page in

11   the brief.

12          THE COURT:  Yeah, I'm sorry, I sort of

13   mistakenly --

14          MR. MOHRING:  The pincite in *Wolfchild*, I was

15   impressed to be able to offer that to the Court.

16          THE COURT:  Yeah, that was pretty remarkable.

17          MR. MOHRING:  We'll get that to you in a minute.

18          THE COURT:  Okay.  Megan beat you to it.  It's

19   page 10.  Thank you.  Give me just one moment to pull this

20   out, please.

21          Okay.  Go ahead, Mr. Mohring.  Thank you.  Sorry

22   for the delay.

23          MR. MOHRING:  So when you look at *I.S. Joseph* and

24   you look at *Pendergraft* and you look at *Wolfchild*, I think,

25   taken together, the decisions show that a threat to file

1   litigation, a threat to file even baseless litigation, is

2   not actionable as extortion, is not criminal.  Says *Joseph*,

3   even a claim based on false and fabricated evidence is not

4   criminal, also a RICO case, as *Pendergraft*.  All that is

5   needed, in fact, is a colorable claim, says *Wolfchild*.  And

6   that if there are issues about that claim, that the proper

7   remedy is dismissal and that concluding otherwise is in fact

8   an abuse of discretion said the Eighth Circuit in *Wolfchild*.

9        And all of that adds together to say that the

10  indictment is deficient in that it is based on a claim of

11  baseless civil litigation, A, being criminal, B.  And we've

12  demonstrated that whether the question of whether this

13  litigation was baseless or a sham or the other synonyms that

14  the government used, that is very much an open question.

15  But even if it was, this body of precedent shows that that

16  cannot form the basis of a criminal fraud prosecution.

17       The government itself even concedes, albeit

18  indirectly, implicitly in their reply that the litigation

19  that is at the heart, at the foundation of this indictment

20  is, in fact, not frivolous.  They talk about conduct that

21  they allege is attributable to Mr. Hansmeier as generating

22  an implied license, but the case law is far from unanimous

23  on that point alone, and the civil litigation is not, you

24  know, pick a word, is not specious, is not baseless, is not

25  sham, is not frivolous, is not fraudulent.

```
 1            THE COURT:  What I'm struggling with, Mr. Mohring,
 2    is that maybe if we view just the question of whether filing
 3    this litigation could give rise to a fraud prosecution in a
 4    vacuum or in isolation, it might be a harder question.  But
 5    the government points out, and the case law is clear, scheme
 6    means scheme.  It means something more than parsing with a
 7    scalpel things into individual discrete allegations and
 8    viewing them each alone.  We have to view them all together
 9    when the statute says scheme.  And there's really good cases
10    that support that idea.  So here it's not just a frivolous,
11    baseless maybe, not frivolous, piece of litigation, it is
12    numerous separate other separate lies that are an effort to
13    maintain that litigation.  That's different from just
14    criminalizing bringing a lightweight lawsuit.  I mean, let's
15    talk about the hacking allegations.  Let's pretend there was
16    nothing in this indictment other than the hacking
17    allegations, which is a complete fabricated lawsuit,
18    arguably.
19            MR. MOHRING:  As alleged.
20            THE COURT:  If true.
21            MR. MOHRING:  As alleged.
22            THE COURT:  Right.  Which we've said enough times
23    we know that means Mr. Hansmeier is presumed not guilty of
24    these charges, the government has an enormous burden to
25    prove them, no one doubts that, but for today our lens is to
```

1    assume they're true, the hacking allegations alone are

2    utterly fabricated, completely fictional cases for

3    litigation, that's the allegation, to get the Court to use

4    its unique and narrowly tailored early discovery, that is

5    not the subject of a fraud prosecution?

6         MR. MOHRING:  It ought not be, no, it's not.  In

7    *Pendergraft* they were talking about false and fabricated

8    evidence.  And so let's talk about -- let's talk about the

9    other cases that the government focussed on.  You mentioned

10   *Lee*.  They also lean heavily on the *Eisen* case out of the

11   Second Circuit, 1992.  The cases that they cite to suggest

12   that that the litigation at the heart is not frivolous and

13   also just that what they have alleged is a permissible claim

14   of a federal fraud -- a criminal fraud prosecution do not

15   hold -- don't hold that, in our view.  We're talking about

16   cases that are beyond the Eighth Circuit and we're talking

17   about cases that are treating -- and would appear to treat,

18   and certainly I would concede this, would appear to treat

19   allegations of serious misconduct that lies outside of the

20   litigation itself beyond the filings in the litigation

21   itself differently.  *Eisen* talked about extensive, extra

22   litigational activity, if you will, bribing, intimidating

23   witnesses, conduct that extends far beyond simply a false

24   allegation or a factual representation to the Court.  The

25   Court talks about the defendants in that case concocting

1    testimony wholly fabricated.

2              THE COURT:  Well, arguably we have that allegation

3    in this case.  Concocting testimony wholly fabricated is not

4    an entirely unreasonable analogy to the perjury allegations

5    that are not just the perjury count but part of the alleged

6    fraud, right?

7              MR. MOHRING:  But you were asking about the

8    hacking.

9              THE COURT:  Oh, if we were viewing --

10             MR. MOHRING:  The hacking allegations.

11             THE COURT:  Right.  Right.  And I guess you have

12   proven my point that we can't look at each of them in

13   isolation, but I feel like the hacking is that -- is sort of

14   pushing back on your idea that this is merely arguably

15   frivolous litigation, that is, allegedly, fictional

16   litigation.

17             MR. MOHRING:  But that is, again, all things that

18   are happening within the context of the litigation itself.

19   The *Lee* case also focussed on extra litigational mailings to

20   the bank, and the conviction relied not even on the lawsuit

21   but on those separate mailings.

22             THE COURT:  What were the mailings to the bank

23   about?

24             MR. MOHRING:  You know, I'm going from memory and

25   I apologize, but *Lee* was sort of a weird kind of quasi tax

1    protestery set of views, I hope I'm getting the case right,

2    in which people would, in line with a set of theories that

3    were educated and sold and materials that were given to

4    them, would close their checking accounts but continue to

5    write checks and suggest to the bank that the bank could

6    proceed in a different manner to collect on those checks,

7    ultimately from the social security account and also

8    ultimately going back to the United States, going off the

9    gold standard in 1933, and so it was a variant of that set

10   of views about history and financial reality and the

11   government.  And so the letters were written to the banks to

12   I believe making that claim and encouraging the banks to

13   actually make good on the checks that had been written after

14   the accounts were closed, at least that's --

15             THE COURT:  That --

16             MR. MOHRING:  That's my memory of it.

17             THE COURT:  How is *Lee* so different with the

18   letters to the banks, though, from here with the settlement

19   letters to the individuals, the pre-litigation settlement

20   correspondence with the individuals?

21             MR. MOHRING:  Well, the letters to the individuals

22   were undertaken in the context of the civil lawsuit itself

23   directly.  The defect that the government I think would

24   suggest, so what was wrong about the settlement letters,

25   what was wrong I think centrally in the government's view

1    about the settlement letters was that the letters didn't

2    indicate what, in the government's view, was that the people

3    who were -- who were asking for settlement, trying to

4    negotiate settlement, had been directly involved in

5    installing the copyright materials that the people that they

6    were asking to settle with had, in fact, downloaded.  That's

7    a very different set of constructs than making a completely

8    unlawful set of suggestions to the bank.  And those letters

9    did not happen in connection with the litigation itself,

10   where these ones did.  I mean, it's common for a lawsuit to

11   be filed and for discovery to happen and for --

12              THE COURT:  But there was no lawsuit filed, at the

13   time most of these letters were sent, there was no lawsuit

14   filed, right?

15              MR. MOHRING:  Well, but there was the application

16   for the Court's authority and for discovery.

17              THE COURT:  But that was started and finished by

18   the time the settlement letters were sent, I mean, the

19   discovery issue was over.

20              MR. MOHRING:  Well, the people had been

21   identified, but, again, all in the context of civil -- all

22   in the -- the civil litigation context.

23              THE COURT:  Okay.

24              MR. MOHRING:  And, certainly, I mean, to the

25   extent that there is tension between the *Eisen* case and the

1    *Lee* case and, again, it is meaningful to me that the

2    universe of cases that we're talking about is as small as it

3    is, but to the extent that there is tension between those

4    cases and the law in the Eighth Circuit, obviously *Joseph*,

5    *Joseph* controls.

6              THE COURT:  Thank you, Mr. Mohring.  I think I'm

7    going to ask you to be seated, if you don't mind, and --

8              MR. MOHRING:  Okay.

9              THE COURT:  -- I've got a quite a few questions

10   that you've already previewed for us for the government.

11             MR. LANGNER:  Good morning, Your Honor.

12             THE COURT:  Good morning.  How are you?

13             MR. LANGNER:  I can tell Your Honor is obviously

14   very familiar with all of the arguments here so I'm going to

15   try to focus in on things that were discussed with

16   Mr. Mohring, and I'm sure you'll be able to ask me whatever

17   questions you may have.

18             THE COURT:  What makes you think that?

19             MR. LANGNER:  I'm just learning as I'm going here,

20   Your Honor.  So turning first to the notion that there is

21   somehow a public policy prescription on civil litigation

22   forming the basis of a criminal fraud prosecution,

23   particularly in this case, I don't think the case law

24   supports that.  As Your Honor pointed out, the *I.S. Joseph*

25   case was fairly limited.  I mean, really what they found was

1   that a threat to sue standing alone does not amount to a

2   Hobbs Act extortion.

3          THE COURT:  It's got some sweeping language for

4   being fairly -- I mean, you're right, it talks a lot about

5   extortion and where it's not talking about extortion it

6   talks about whether two acts can constitute a, you know, I

7   keep forgetting my magic RICO words, but a pattern of action

8   but it makes some broad proclamations of the idea that we

9   shouldn't use criminal prosecutions to prosecute litigation

10  shenanigans.

11         MR. LANGNER:  I understand.  And in the context of

12  that case you have two shipping companies that are in the

13  middle of settlement negotiations and one of them says

14  they're going to sue the other one, I mean, that is

15  litigation shenanigans I suppose as you put it.  But I think

16  that's a far cry from what we have here.  We have --

17         THE COURT:  Well, there's fraudulent allegations

18  underlying an attempt to get a settlement.  There's -- I

19  think there's some actual falsities, like, flat falsities in

20  order to get a settlement.  I mean, it's a different theory,

21  it not criminal, it's civil, and it's a different theory of

22  prosecution, but it certainly sort of stands for the idea

23  that we should be cautious in converting even egregious

24  litigation activities into a crime.

25         MR. LANGNER:  And I think to the extent that, you

1    know, we need to be cautious about, you know, chilling

2    access to the courts, I just think this is a case is not an

3    example of where there's likely to a problem.  I mean, when

4    you have two parties, we want them to resolve their disputes

5    in civil court and so if they get into a fight in the

6    context of, you know, trying to figure out what they should

7    do, you know, we don't want that to become a criminal issue.

8    When you have somebody that's engaging in the extensive

9    fraudulent deceptive construct that Mr. Hansmeier was and

10   taking advantage of, you know, people that are getting these

11   letters and out of sort of fear making these payments, I

12   don't think we're running into that public policy.  And, you

13   know, the public policy is I think obviously dicta in that

14   case and it's not articulated in terms of what should or

15   shouldn't happen in any one case.  And I don't think, you

16   know, we should interpret that to mean that you cannot bring

17   criminal prosecutions out of civil litigation when there is

18   a clear fraudulent construct that exists outside of

19   litigation as there is here.

20             THE COURT:  Can I ask some questions about the

21   non-litigation related fraudulent construct, because it

22   feels to me like this entire construct was for the purpose

23   of litigation or, you know, collateral to litigation related

24   activities, unlike the *Lee* case where there's, you know,

25   fraud related to trying to pay off a mortgage with

1    nonexistent money.

2              MR. LANGNER:  Right.

3              THE COURT:  Here it is all about either the using

4    the courts, the threatening to use the courts to collect

5    money from people.

6              MR. LANGNER:  I mean, this is more like the *Eisen*

7    case, frankly.  The *Eisen* case is a situation where you have

8    a law firm and investigators that are creating a fraudulent

9    construct in order to get settlements out of insurance

10   companies.  I mean, that's essentially what you have here.

11   Their goal -- I mean, the thrust of our indictment here is

12   that their goal was to get money from these victims or these

13   people that had downloaded their movies or potentially

14   downloaded their movies.  The court system or using

15   litigation was not -- they only came to court because they

16   had to get the identities of these people.  Our allegations

17   are that that, I mean, was a necessary step but really the

18   focus was generating settlement fees from people outside of

19   the litigation context.

20             THE COURT:  With the threat of litigation.

21             MR. LANGNER:  With a threat of litigation, yes.

22   And, again --

23             THE COURT:  Can I ask, and I apologize for my

24   naïvety or maybe misunderstanding of your position, let's

25   imagine the exact same scenario where there wasn't the

1   allegation of uploading so something closer to the *Malibu*

2   *Media* line of cases maybe where there is a actual third

3   party as opposed to the allegations here that owns these

4   copyrights, there is sitting around on BitTorrent or

5   whatever the cyber version of that is waiting for somebody

6   to upload those movies and going to the court and saying we

7   own the copyright to this movie with a horrible title, give

8   us the identity of the person -- or the most likely identity

9   of the person who uploaded, the identity of the person who

10  owned the ISP and going to that person and saying if you

11  don't pay me $5,000, I will sue you under your name and it

12  will be very embarrassing for you.  That is not fraudulent,

13  right?

14        MR. LANGNER:  Standing alone, while it might be

15  distasteful, I don't believe it would be fraudulent, at

16  least, you know, that has not been ruled fraudulent anywhere

17  that I'm aware of.  I would agree that if that was the only

18  conduct that we had at issue, there was a client or a third

19  party that actually owned those things and when coming to

20  court to get permission to get early discovery they were

21  honest with the court about what had happened and what they

22  were doing, yeah, I would agree that that's not fraudulent.

23  But that's not what happened here, obviously.

24        THE COURT:  And here the distinctions are, one,

25  that it wasn't done by a third party but there was a

1    pretense that it was; two, that it had been uploaded.

2              MR. LANGNER:  Correct.

3              THE COURT:  And those are the only real

4    distinctions just between that part of what -- I recognize

5    there's other stuff, that part of this fraud, those are the

6    distinctions?

7              MR. LANGNER:  I mean, I think that there's more

8    conduct than just that.  I realize that they all fit within

9    sort of those categories, but we have them, you know,

10   creating these sort of sham companies to pose as clients.

11   They domiciled these in Nevis in order to disguise their

12   ownership over them.

13             THE COURT:  But people do that all the time with

14   legitimate businesses, right, people try to create multiple

15   financial structures that protect individual humans from

16   liability for that what their businesses do, aren't there

17   entire financial services industries designed to do that?

18             MR. LANGNER:  There are.  And but what you're

19   getting into is what the intent is behind it and that's

20   obviously a fact we would allege and we have alleged that

21   the intent behind that was to disguise from courts who

22   really controlled these clients, because they knew, and I

23   think the evidence, as well as our allegations, will show

24   that they knew that if they went to the court and told the

25   courts what they were doing, the totality of it, that they

1    actually controlled their clients, that they were

2    essentially running a settlement mill and that they had

3    uploaded these movies online, that the courts would never

4    have given them early discovery, and I think that that's

5    played out in what actually happened in this case, let alone

6    our allegations in the indictment.

7         Now, you also have them, I mean, I'm just going

8    through the things.  I realize these all do fit within the

9    categories that you articulated, but they also went and

10   filmed their own pornography.

11        THE COURT:  Not a crime.

12        MR. LANGNER:  And obviously they're allowed to do

13   that, but the whole point of doing that was not to, you

14   know, sell this or make any money from it but simply to

15   upload it in order to get settlements from people.  They

16   then went and obtained copyrights on that, again, not so

17   that they could market this and sell it and make money from

18   it or do anything else other than to try and generate

19   copyright violations.

20        THE COURT:  Let's say that had been done by a

21   business who said I'm going to make a really cheap horrible

22   sounding pornographic movie, I'm going to hire you to

23   prosecute -- I'm going to hire you to prosecute all of the

24   people who get their hands on it, that is not a crime,

25   right?

1          MR. LANGNER:  Well, I mean, what ultimately --

2          THE COURT:  Making a movie for copyright

3     entrapment purposes or whatever term you want to use, that's

4     not a crime.

5          MR. LANGNER:  I mean, what ultimately makes this a

6     crime is deceiving the courts, right, so if you're honest

7     with the court about doing all of these things, you know,

8     then I -- I would be hard pressed to say there's a crime

9     here.  If you tell people what you're doing, even if these

10    things are all, you know, deceptive and lies, then it takes

11    away any intent to deceive or scheme to defraud.  But, yeah,

12    I mean, each of these things, I think if you're not telling

13    the Court that it's going on, it could constitute a

14    fraudulent offense, even so far as, you know, creating the

15    copyrights yourself and owning your own client, I think

16    those things would be significant to a court, they would

17    want to know those things in issuing early discovery, and so

18    that could be a fraudulent offense.

19          Now, you know, we'd be in a slightly different

20    situation, so there would be some question of, you know,

21    does the government want to charge this, how would a court

22    view it, I think we have so much conduct here that there's

23    less question than in the scenario that you articulated.

24    But I still think if you're lying to the court in order to

25    get early discovery and you use that in order to get

1    settlements from these people, that is the fraudulent

2    construct at issue here.

3          THE COURT:  Are you alleging that the early

4    discovery part of the scheme was a lie or an omission?

5          MR. LANGNER:  I think it depends.  In looking at

6    the motions that were filed, there is both.  I believe that

7    a false statement, I mean, if you say something that without

8    more information makes it false, I believe that's still a

9    false statement, and I think we have a lot of that where

10   they say something in the motion or even in the complaint

11   where standing alone that, you know, without the additional

12   information to understand what they said, that would be

13   false.  Now, there clearly is a lot of omissions as well.

14   So I do think there's both in this case, and we would be

15   proceeding under both.

16         THE COURT:  And you think, let's imagine those are

17   just omissions, that's okay?

18         MR. LANGNER:  Yes.

19         THE COURT:  You- -- okay.  So one of the concerns

20   that Mr. Hansmeier's team raised in their motion was the

21   chilling effect and the assumption that courts wouldn't want

22   to chill civil litigation, even frivolous.  I'm not sure

23   that all courts all days would necessarily agree with that.

24   But he raised a very specific concern which is the idea that

25   chilling can go beyond this arena of litigation into all

1    kinds of arenas, and I'm trying to think of an analogy for

2    what you're alleging because --

3            MR. LANGNER:  I think perjury is a good, I mean,

4    obviously we want people to come in and we want them

5    testify.  I mean, that's something that we want to encourage

6    in the civil litigation system.  And yet, if they come in

7    and they don't tell the truth, we will prosecute them for

8    perjury.  You know, there are two things going on, one is

9    that you want to encourage the use of the civil litigation

10   system and the other is you don't want it to be misused in a

11   way that's fraudulent or dishonest.

12           THE COURT:  Was it *Pendergraft* where there were

13   un -- undisputed fraudulent affidavits and that wasn't

14   enough?

15           MR. LANGNER:  I mean, *Pendergraft* turned on

16   whether there was an intent to defraud ultimately.  What

17   they said was yes, they were false affidavits, however, you

18   knew that the person you were sending it to didn't really

19   believe them so therefore you couldn't have had the intent

20   to defraud.

21           THE COURT:  Which isn't the law anyway so it's a

22   little confusing because the success of the fraud isn't the

23   point.  But there, it's sort of like your perjury analogy,

24   those were flat lies in those affidavits and that wasn't

25   enough to give rise to I think it was criminal charges, it

1        might have been civil RICO.

2              MR. LANGNER:  I mean, that's not what *Pendergraft*

3        actually held.  I realize -- I think their reasoning is a

4        bit circumspect and they go out of their way to try to reach

5        a conclusion, but they didn't hold that false affidavits

6        aren't enough.  And I think the *Lee* decision that came

7        afterwards made pretty clear that that holding is fairly

8        limited and that there isn't some broad prescription against

9        civil litigation activities forming any part of a criminal

10       prosecution.  Obviously there are some concerns, there are

11       some policy issues that have to be addressed both in terms

12       of what the government decides to do.  But I think we're

13       pretty far afield from that and I -- and there is no case

14       law that draws any sort of bright line or even a vague line

15       as to, you know, what you can or can't do, and without that

16       I think we have to go back to the broad purpose of the fraud

17       statutes which are to remediate instances where somebody

18       uses dishonest activity to obtain money or property.

19             And I think, you know, Justice Holmes' quote I

20       think shows that utility and the purpose of that utility

21       when he says that, you know, that the law doesn't define

22       fraud, it's as versible as huge ingenuity.  People find new

23       ways to use dishonesty to obtain money every day.  And the

24       fact that they use the litigation system as part of that I

25       don't think should get in the way of a criminal prosecution

1    where it's warranted and particularly in the facts of this

2    case.  I just don't think that this is going to have any

3    sort of chilling activity on civil litigants.  There is so

4    much fraudulent activity and dishonesty even outside of the

5    litigation context.  We don't concede that that is at all

6    the law in any of these cases.  But even if you were to look

7    at it that way, there's so much outside of the litigation

8    context that I just don't think that public policy, to

9    whatever extent it exists, is implicated by this case.

10             THE COURT:  Let me ask this.  I'm having a hard

11   time finding any case law that suggests the uploading fact,

12   as I want to call it, is something other than a defense.

13             MR. LANGNER:  I don't think it --

14             THE COURT:  That it undermines the prima facie

15   invalidity, and the analogy I keep thinking of let's imagine

16   a 1983 case where somebody claims excessive force against a

17   law enforcement officer, this obviously would have much

18   greater public policy concerns about the chilling effect,

19   right, but somebody claims excessive force in their arrest

20   and talks about how they were, you know, treated roughly or

21   thrown to the ground or in other ways mistreated during

22   their arrest and omits the truth, let's imagine in this

23   hypothetical that they were punching and kicking and yelling

24   and stomping so that is a defense to the 1983 claim that is

25   not set forth in the complaint that clearly sort of

1      undermines the validity of the claim maybe out of the gate.

2              MR. LANGNER:  Right.

3              THE COURT:  They don't have an obligation to flag

4      that defense for the defendant, right.  They don't have an

5      obligation to put that in their complaint, they don't have

6      an obligation for when they ask the Court to use its

7      subpoena power to -- or to serve the complaint, maybe

8      through the marshal's service, to reveal that.

9              MR. LANGNER:  I think, though -- I mean, first of

10     all, I think the underlying, you know, whether this is

11     defense viable or not, we disagree obviously on what the law

12     holds, but I think it's beside the point.  I mean, and I

13     think you got to this in saying that really this is about

14     getting the early discovery.  Once they get the early

15     discovery, they go get the settlements, the case falls --

16     they have no interest in litigating this.  In fact,

17     litigating this beyond the one step is antithetical to what

18     they're trying to accomplish.  And I do think they have an

19     obligation to disclose whatever facts exist even if they're

20     material to their position.  And they knew, if you look at

21     their behavior, if you look at our allegations, they knew

22     that this information would have been material to a judge in

23     ruling on this.

24             THE COURT:  Where does that obligation come from?

25     Where is their obligation to reveal a fact that is damaging

1   to their chance of litigation success in their discovery

2   application, where does that obligation come from?

3          MR. LANGNER:  Well, the point of the early

4   discovery request is to get early discovery and the duty of

5   candor is to reveal information not only, you know, that's

6   positive for your position but anything that might be

7   material to your position, and facts that would be, you

8   know, material to a judge's decision, even if they were

9   adverse to you about whether they're going to grant you

10  early discovery, are relevant.  I think that's well laid out

11  in the rules of professional conduct.

12          And I mean, this isn't a hypothetical.  They knew

13  that their own control and ownership and uploading of this

14  stuff was going to be relevant to a magistrate judge or

15  whoever it was that was deciding whether to issue early

16  discovery.  And it actually, it played out that way.  I

17  mean, I realize it's after the fact, but when judges found

18  out even that one fact, just that they actually controlled

19  their own clients, they shut this down and they said you're

20  not going to misuse our court to run a settlement mill.

21  We're not going to --

22          THE COURT:  But we have all kinds of information

23  in civil litigation that a party doesn't reveal to the judge

24  or the other side because it's dangerous -- it -- it's

25  contrary to their position even though they maintain their

1    duty of candor to the Court which is, if you ask me I will

2    tell you the truth and I won't try to create a false

3    impression, but does that extend to an affirmative duty to

4    disclose a fact about which I'm not asked but I think that

5    you'd probably like to know?  I mean, I recognize the proof

6    is in the pudding.  The magistrate judges, the district

7    court judges, they did want -- had they known this

8    information, they would not, let's assume for a moment,

9    would not have issued these.  I think that's probably hard

10   to dispute.  That goes to materiality.  I'm not sure it goes

11   to the duty to disclose.

12           MR. LANGNER:  I understand.  And I think we are

13   wading into sort of the facts of what will play out, but I

14   do think that that duty includes information that you know

15   that that judge would want to know that's material and,

16   frankly, would work against the relief that you're

17   requesting from, so yes, I do believe that duty extends that

18   far.  And I mean, we're not talking about things that are

19   kind of at the fringes here.  I mean, we're talking about

20   some very central things that magistrate judges were so

21   outraged by that they immediately shut this down, referred

22   them for criminal prosecution, you know, imposed sanctions.

23   These are not facts that one might wonder will the judge

24   want to know this or should -- I mean, this is pretty

25   central to what they're trying to do and they knew they

1    needed to hide this by virtue of their own conduct.

2            THE COURT:  Let's imagine that instead of talking

3    about the early discovery part we're talking about the

4    complaint, so let's imagine that there was a complaint filed

5    alleging that somebody downloaded the movie and omitting

6    that I uploaded the movie in the first place, that is less

7    clearly criminal, right?  It's not flagging a defense for

8    the other side, but there's no *Brady* in civil litigation.

9            MR. LANGNER:  Right.  I mean, we are running

10   pretty far afield because without the early discovery,

11   without the effort to misuse the Court's subpoena power to

12   go get settlements, you know, you're almost running into a

13   factual defense of I really am trying to litigate this claim

14   and this stuff might come out in the litigation.  I think --

15           THE COURT:  And then we're closer to the --

16           MR. LANGNER:  I mean, we're closer, right.  I

17   mean, I don't know that I would want to concede that because

18   I think if you make false statements in the affidavit,

19   clearly with some of the other conduct, you know, we could

20   still have a fraudulent scheme, but you're taking away

21   really one of the main thrusts of what we've alleged which

22   is that what they were trying to do was misuse the early

23   discovery in order to get the settlement fees, so you're

24   weakening my argument by taking that out.

25           THE COURT:  I'm just -- I'm trying to, this is

1    sort of a frontier case.  It's -- it's unique, and I'm

2    trying to figure out some of the edges around both sides'

3    arguments.  If -- if you're arguing that there is no civil

4    litigation conduct that should be protected from criminal

5    prosecution, if Mr. Hansmeier's team is arguing that no

6    civil litigation conduct could ever give rise to criminal

7    prosecution, I'm trying to figure where the line is and

8    which side of the line this case could fall on.

9              MR. LANGNER:  Right.

10             THE COURT:  So that's why I keep pushing --

11             MR. LANGNER:  No, I understand.

12             THE COURT:  -- on hypotheticals that I recognize

13   are worse than the case that you are alleging.  So I think I

14   had just one other question for you.

15             MR. LANGNER:  Sure.

16             THE COURT:  And I guess this is sort of irrelevant

17   because we keep reminding ourselves that we're dealing with

18   the landscape set forth in the indictment rather than you

19   might or might not be able to prove at trial, but is the

20   evidence going to show many complaints that were actually

21   filed in this litigation?

22             MR. LANGNER:  Well, I think they filed many

23   complaints because it was the precursor to getting their

24   early discovery, generally, at least that's the way they

25   operated it, they would do those two things in conjunction.

1          THE COURT:  A complaint with a John Doe.

2          MR. LANGNER:  Right.

3          THE COURT:  Seeks the early discovery.

4          MR. LANGNER:  Right.

5          THE COURT:  And then what would happen with the

6    complaint?

7          MR. LANGNER:  Not in every case but in almost

8    every case is it was dismissed.

9          THE COURT:  And what would happen when it wasn't

10   dismissed?

11         MR. LANGNER:  You know, it varied.  I'm not sure

12   that I could give the Court a complete articulation of that.

13         THE COURT:  Okay.

14         MR. LANGNER:  And I'm trying to remember some of

15   the purposes why they went on, but there were some cases

16   that, you know, they would -- if they weren't getting

17   information from the service providers, they might need to

18   go back, sometimes the Court would say you need to identify

19   a specific person and they would seek default judgments if

20   they just couldn't get ahold of somebody, but I think that

21   was in the minority.

22         I mean, most -- most of these cases were John

23   Does, and many of them were, initially at least, in the

24   thousands of John Does or at least in the tens and hundreds

25   of John Does so that they could generate as many settlements

1    with as little litigation as possible.  And when the courts

2    got to the point where they started saying, you know what,

3    we're not going to let you just do a thousand John Does and

4    we're going to start asking some questions is when they

5    shifted into trying to do the hacking allegations because

6    what they realized is by using the computer fraud and abuse

7    act they could allege a conspiracy, get a bunch of people

8    into one complaint and then they recruited ruse defendants

9    who weren't going to ask questions.

10            I mean, and these are very important facts in

11   establishing what their true intent was.  I mean, why

12   recruit ruse defendants who are going to pretend to be a

13   defendant if your point is to actually litigate a claim?  Of

14   course that's going to come out.  And in fact, they promised

15   these people that they would dismiss the case as soon as

16   they got discovery.  So I don't want to over generalize an

17   answer to your question, but I know that there were at least

18   some cases that for whatever reason they pushed forward and

19   named a defendant in order to try and wrap it up quickly.

20            THE COURT:  Okay.  I think that that is the set of

21   questions I had for you.  I've given you much less time than

22   I gave to the defense.

23            MR. LANGNER:  That's okay.

24            THE COURT:  Anything else you want to share with

25   me or have me keep in mind?

1          MR. LANGNER:  I don't think so.  I mean, I can

2     tell Your Honor is already aware of our brief.  The one

3     other thing I'd emphasize is that, you know, the violations

4     of the ethical rules, obviously we're not arguing that those

5     in and of themselves somehow constitute fraud, but our

6     allegations in relation to the violation of the ethical

7     rules serve a purpose, to show materiality, to show a duty

8     to disclose or as evidence of intent to defraud, so, you

9     know, we're not arguing that those standing alone somehow

10    constitute fraud, but I think I've covered all of the other

11    points I wanted to make.  Thank you.

12          THE COURT:  Okay.  Thank you very much.

13    Mr. Mohring, I'll give you a couple of minutes.

14          MR. MOHRING:  Thank you, Your Honor.  Well, I'd

15    like to just speak a little bit to policy and the role that

16    I think the policy considerations that we've raised ought to

17    play in the Court's consideration of this motion to dismiss.

18    We've identified a number of specific defects, what we see

19    as -- in -- and as supported as specific defects in the

20    indictment, each one of which is sufficient in light of the

21    authority that we've cited, to support a motion to dismiss.

22          The prosecution in partial response and the Court,

23    one of the Court's questions of the prosecution here this

24    morning suggested that, you know, the whole is greater than

25    the sum of the parts, and I want to push back on that a

1    little bit.  If the parts are invalid, the whole cannot be

2    valid.  And I'm not aware of any case, and the government

3    has certainly not cited any, for the proposition that a

4    viable criminal accusation can be based on a collection of

5    invalid pieces.  And so on its face the indictment is

6    deficient in a number of ways that we've demonstrated, and

7    you don't have to look to policy to reach that conclusion.

8            But I think that the biggest context in which this

9    lawsuit is being brought is relevant in at least two ways.

10   We are talking about copyright litigation in what is a new

11   era.  The prevalence of digital media and the ease of

12   copying and disseminating digital media presents a real

13   challenge to making real the copyright protection that is

14   written on the books, bringing that into reality.  But there

15   is also the fact that an -- and I don't think that it can be

16   disputed that what the government is endeavoring to do is to

17   selectively criminalize a component of civil litigation.

18   And I hear the prosecution saying that you don't have to

19   worry about chilling here, and I'm glad that they have that

20   view.  It would be deeply offensive if they did not.  But

21   just because they say that you don't have to worry about it

22   doesn't mean that that is not a legitimate set of concerns

23   for the Court to have.

24           We speak at length, and I won't go into that level

25   of detail here, about how central to the functioning of this

1      society our principles of free and open access to the civil

2      court system as a way of peaceably resolving disputes, and

3      that set of concerns go deep.  They're implicit in the

4      Federal Rules of Civil Procedure and the evolution from

5      notice pleading -- from forum pleading to notice pleading

6      that has gone on and --

7                THE COURT:  But that has limits, Mr. Mohring.  I

8      mean, there's no doubt that even our, as you describe,

9      reverence for civil litigation and the rule of law doesn't

10     preclude prosecution for perjury as Mr. Langner, you know,

11     suggests or prosecution for obstruction of justice or

12     prosecution for conduct in the civil litigation arena that

13     is clearly criminal and sending people to prison for it.

14               MR. MOHRING:  Right.

15               THE COURT:  So it's not immune.  The more

16     difficult question is, is it fraud?

17               MR. MOHRING:  Right.  And in answering to that

18     question, to which I hear what you're saying as far as, you

19     know, where should the line be, but in answering that

20     question, the fact that what we are talking about is an

21     effort to criminalize civil litigation is relevant.  The

22     fact that that is happening in the arena of copyright where

23     the challenges, the societal challenge of bringing, actually

24     having the protections that the statutes afford, having

25     actually have a meaning in reality is -- has been deeply

1    challenged by the changes and developments in technology.

2    And I would suggest that -- I mean, part of what I hear the

3    prosecutor saying about you don't need to worry about that

4    because this is unsavory litigation, I --

5                THE COURT:  I think they're saying that this is

6    fraudulent litigation --

7                MR. MOHRING:  Right.

8                THE COURT:  -- rather than unsavory.

9                MR. MOHRING:  They are --

10                THE COURT:  The porn troll normative aspersions

11    assumes a third-party owner, non-uploading and it is still

12    considered unsavory.  If that's what was being prosecuted,

13    we wouldn't have spent an hour and ten minutes on the motion

14    to dismiss.  I think it goes beyond unsavory when there is

15    -- or they allege it goes beyond unsavory when there are

16    such extensive fraudulent false and omitting relevant facts

17    throughout all aspects of the scheme and the hacking scheme,

18    the perjury plan, the third party allegedly sham entities,

19    the concealing the true ownership nature, the concealing of

20    things that would have, had they been revealed, not led to

21    the issuance of early discovery.  I recognize that it's

22    dangerous to say, oh, as long as they all kind of gloss

23    together and something sounds bad, that constitute fraud,

24    but we were kidding ourselves to view each one in isolation

25    and ignore the others, and the case law really admonishes

1    that that is true.

2            MR. MOHRING:  But if the individual -- again, if

3    the individual pieces are defective, the whole is also

4    defective, and I think that we have --

5            THE COURT:  But they would all have to be pretty

6    defective.

7            MR. MOHRING:  And so, I mean, the Court has said

8    we're beyond unsavory.  Obviously the real question is not

9    whether we're beyond unsavory or whether we're not, we can

10   agree to disagree about that, but whether we are, in fact,

11   past and into criminal.  And on that, the fact that we are

12   treading into and using civil litigation and trying to

13   criminalize that is relevant and so in making a decision of

14   whether that's a step that really should be supported here,

15   the last piece that I would make, the thing that I want to

16   say to the Court, is that that is a step that should be

17   taken very carefully and only in a -- under circumstances of

18   great need, and I do not see that need here, specifically

19   because, as is abundantly demonstrated in the pleadings

20   before the Court, the existing processes, the normal

21   processes, at which the type of concerns the government is

22   raising here in this criminal prosecution get ventilated and

23   discussed and adjudicated, are all functional.

24           The term says criminal prosecution in this case is

25   both radical and unnecessary because of the civil processes

1     that we used extensively and effectively along the way, from

2     dismissal of actions to case specific sanctions, aggravated

3     and enhanced attorney fee orders, and the quite extensive

4     activity of attorney disciplinary processes, and, you know,

5     maybe the need from a policy perspective to step into the

6     criminal realm would be more clear if none of that stuff had

7     happened or if those processes were shown to be ineffective

8     or deficient but they're not.

9          THE COURT:  Isn't it pretty clear in the law that

10     the decision if, if there is a legally viable criminal

11     prosecution and less onerous civil regulatory or other civil

12     penalties, it is not up to me or Judge Ericksen but up to

13     the prosecutor which of those to deploy?

14          MR. MOHRING:  The decision whether to a charge is

15     a matter of prosecutorial discretion, but the evaluation --

16          THE COURT:  But the decision whether to use a

17     lesser sanction, a non-criminal sanction, if both are

18     legitimate, which I recognize you're not conceding, that, I

19     can agree, hypothetically, that those lesser civil remedies

20     were legitimate, but my feeling that because they could have

21     done less they shouldn't have done this is not the same

22     thing as they can't do this, and I find no support in the

23     case law for the idea that my belief that other lesser

24     choices would adequately deter this precludes them from

25     being able to use the greater criminal sanction if it is a

1    legally viable theory.

2          MR. MOHRING:  I don't disagree with any of that.

3    My only point is that in being invited to take what we view

4    as a very dangerous step into new territory, the adequacy of

5    existing structures is an appropriate consideration.

6          THE COURT:  Okay.  Thank you.  Thank you very

7    much.

8          A couple of observations.  I have seriously

9    considered the motion for the Bill of Particulars.  I'm

10   going to deny the motion for the Bill of Particulars.  If

11   there were concerns about lack of clarity and the

12   government's theory, I -- I find those somewhat unpersuasive

13   in the face of a really extensive indictment.  And I know

14   that the case law surrounding the Bill of Particulars

15   doesn't extend to answering all of the questions that the

16   defense might have.  But to the extent that that would have

17   been a stronger motion prior to the government's response to

18   the motion to dismiss, I think any things that could ever

19   rise to deficiency and with detail have been corrected.

20         The case law makes really clear that the Bill of

21   Particulars cannot correct omissions in a motion to dismiss

22   and so that they can't fix -- or an indictment so they can't

23   fix flaws with a Bill of Particulars, nor can the Bill of

24   Particulars undermine valid arguments or valid theories set

25   forth in an indictment.  So I think as a facial matter I

1    would have denied it anyway absent the extensive briefing

2    and conversations that we've had, but in light of the

3    extensive briefing and conversations that we've had, the

4    standard in our circuit for when a Bill of Particulars is

5    necessary has been more than satisfied.

6            Mr. Mohring and Ms. Atwal, I recognize that you've

7    identified a list of questions that the indictment doesn't

8    answer, and I think they're correct questions that the

9    indictment doesn't answer, but the Bill of Particulars isn't

10   about getting an answer to all of the questions we might

11   have, although I encourage you to ask opposing counsel to

12   ask those questions.  At this point, I will be denying the

13   motion for the Bill of Particulars.

14           Mr. Mohring, would you like to make any record

15   with respect to that?

16           MR. MOHRING:  Your Honor, I would push back just

17   on this point.  The indictment characterizes an extremely

18   sweeping in imprecise ways a number of potential victims in

19   this case and the answer to the fundamental -- but the

20   answer to the fundamental question is, okay, if there was a

21   fraud, who was the victim, how were they victimized, and

22   what are the damages, what was the loss, that is something

23   that -- that is not reflected in the indictment.  The

24   indictment talks about fraud on the court type of stuff.

25   Are you a victim in this case?  Is Judge Ericksen?  Are the

1    judges of this court?  The answers to those questions have

2    profound jurisdictional implications to the extent that the

3    motion to dismiss is denied.

4           And so I push back within the context of the Bill

5    of Particulars because the indictment is so vague on the

6    concept of who the actual victims are.  I would push back on

7    that in the context of the Bill of Particulars, in the

8    context of a *Agers* specific *Brady* request for exactly that

9    information.

10          And I would also say that we're also well within

11   the scope and I believe that we articulated or tried to at

12   least articulate this point in the discovery response to the

13   government's response to our motion, separate from the

14   motion to dismiss response, that I think we're well within

15   the parameters of Rule 16, that information or documentation

16   about who the victims are, documentation of their

17   victimization and the specific -- and any loss that those

18   documents are directly relevant to preparation of the

19   defense in this case.  And so --

20          THE COURT:  Which isn't --

21          MR. MOHRING:  -- Rule 16 --

22          THE COURT:  -- about the Bill of Particulars but

23   the discovery.

24          MR. MOHRING:  Beg your pardon?

25          THE COURT:  That is not about the Bill of

1    Particulars but discovery?

2         MR. MOHRING:  The Rule 16 entitles us to this

3    information that we're asking for.  The Bill of Particulars

4    articulates the same request and the *Brady* motion

5    articulates the same request.

6         THE COURT:  Okay.

7         MR. MOHRING:  And so I'm pushing back especially

8    just on information about victims about which the indictment

9    itself is vague and unspecific.

10        THE COURT:  Okay.  Thank you.  Mr. Langner, I do

11   have a question for you about that.  Have you provided

12   information about who the government considers to be victims

13   in this matter?

14        MR. LANGNER:  I believe so.  And we've had

15   discussions about that topic.  I understand they may not

16   like our answers, but the victims in this case were the

17   people that provided settlement fees to Mr. Hansmeier and

18   Mr. Steele.  Any information we have about who those people

19   are, I mean, their names or --

20        THE COURT:  And have you provided names, to the

21   extent that you have them?

22        MR. LANGNER:  Yes.  Now, if it's in the Jencks

23   materials, we'll be turning that over separately, but any

24   information that we have anywhere else has been turned over

25   or made available.  Now, obviously a lot of these are John

1     Doe lawsuits and so tying up the amount that was paid to

2     maybe a check or a series of checks that are in the bank

3     accounts, I mean, we've done some of that work.  The

4     defense, you know, either might have to do that work or

5     we'll have to talk about, you know, who these people are,

6     but all of the information we have is available to them, and

7     so who these people are, it should be, you know, apparent,

8     to the extent that we can figure it out, anyway.

9             THE COURT:  Okay.  Thank you.  Anything else on

10    any of the motions on behalf of Mr. Hansmeier?

11            MR. MOHRING:  No, not for this morning.  Thank

12    you, Your Honor.

13            THE COURT:  Okay.  Anything else from the

14    government?

15            MR. LANGNER:  No, Your Honor.

16            THE COURT:  Okay.  Before we recess, I would like

17    to note that I believe we have the honor of having Andrew

18    Mohring before us for his final court appearance after

19    28 years of service as an assistant federal defender.  And

20    on behalf of the Court, on behalf of his colleagues, his

21    former colleagues, his opponents, but most importantly, on

22    behalf of his clients who have benefitted from his service,

23    thank you for 28 years, and I'm glad I got to preside over

24    that last appearance.  It's a little sentimental.  And we

25    will get a ruling on this very important motion to dismiss

1     out as soon as possible.  Thank you.  We are in recess.

2               MR. MOHRING:  Thank you, Your Honor.

3          (Proceedings concluded at 10:23 a.m.)

4

5                              *      *      *

6

7

8          I, Staci A. Heichert, certify that the foregoing is

9     a correct transcript from the record of proceedings in the

10    above-entitled matter.

11

12              Certified by:  *s/ Staci A. Heichert*

13                             Staci A. Heichert,
                               RDR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25