UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 0:16-cr-00334-JNE-KMM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| (1) Paul R. Hansmeier, | |
| Defendant. | |

Benjamin F. Langner / David J. MacLaughlin, Assistant United States Attorneys, counsel for the government

Manvir K. Atwal, Assistant Federal Defender, counsel for Mr. Hansmeier

    Paul Hansmeier has been charged in an eighteen-count indictment with conspiracy to commit mail and wire fraud, mail fraud, wire fraud, conspiracy to commit money laundering, and conspiracy to commit and suborn perjury. Indictment ("Ind."), ECF No. 1. He has moved to dismiss all charges except the last, arguing that, even if the facts alleged in the indictment were true, they do not constitute fraud. *See* Pretrial Mot. to Dismiss, ECF No. 48.

    If the indictment against Mr. Hansmeier read as he described in his briefing—and did nothing more than attempt to criminalize an aggressive approach to civil litigation—the Court would recommend that his motion to dismiss be granted. However, the indictment alleges far more than creative lawyering on the part of Mr. Hansmeier and his co-defendant, John Steele. The indictment describes a fraudulent scheme that, if proven, would violate the law and Mr. Hansmeier's arguments to the contrary do not persuade the Court that the indictment is fatally flawed. Therefore, the Court recommends denial of the motion to dismiss.

## I.   The Indictment

Mr. Hansmeier and Mr. Steele were charged with eighteen criminal counts on December 14, 2016, all of which relate to an overarching scheme to defraud.[1] For example, the substantive mail and wire fraud counts (Counts 2 through 16) allege specific criminal acts which are also overt acts for the fraud conspiracy charge (Count 1). And the money laundering conspiracy count (Count 17) charges the defendants with conducting financial transactions with funds that they knew to be ill-gotten gains from the fraud scheme. The heart of Mr. Hansmeier's motion to dismiss is his assertion that the underlying scheme alleged is not criminal, but is instead merely an aggressive and pioneering approach to copyright litigation. In order to assess this argument, it is necessary to closely examine how the government actually describes the alleged scheme to defraud.

According to the indictment, between 2011 and 2014, Mr. Hansmeier and Mr. Steele "knowingly conspire[d] . . . to devise and participate in a scheme and artifice to defraud" and to obtain money and property by means of false representations, and that they used mail and wire communications to do so. Ind. ¶ 16. The alleged scheme involved uploading pornographic movies to file-sharing websites, obtaining the IP addresses of individuals who downloaded those movies, improperly using civil litigation proceedings to discover the identities of the individuals, and then seeking settlement payments in exchange for not naming them as defendants in a copyright infringement lawsuit.

The government claims that Mr. Hansmeier and Mr. Steele, both attorneys, began the scheme by directing an individual who worked for them to upload their clients' pornographic movies to Pirate Bay, a BitTorrent website. Ind. ¶ 20. This direction was given with knowledge that BitTorrent sites are used for sharing files, often to avoid paying any fees to copyright holders of the original materials. Ind. ¶ 20. The defendants then filed lawsuits in state and federal courts against "John Doe" defendants identified only by the IP addresses of the computers that downloaded the films, and sought early ex parte discovery to obtain the names and addresses

---

[1]   Mr. Steele has since pleaded guilty to one count each of conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering. *See* Am. Mins., ECF No. 42.

associated with those IP addresses from Internet Service Providers. Ind. ¶ 23. Once the individuals had been identified, the defendants contacted them, seeking settlement payments in exchange for not naming them in copyright infringement lawsuits where they faced up to $150,000 in damages per infringement and the potential embarrassment of public litigation related to pornography. Ind. ¶ 19. At no point did the defendants disclose their role in uploading the movies to the BitTorrent site or their direct personal financial interests in the litigation to the courts from which they sought ex parte early discovery or to the individuals from whom they sought settlement payments. *See* Ind. ¶¶ 23-24.

In November 2011, the defendants began actively concealing their participation in the copyright infringement lawsuits. For example, the indictment alleges that Mr. Hansmeier and Mr. Steele caused Prenda Law to be created to litigate the copyright cases. Ind. ¶ 25. While the law firm was nominally owned and run by another lawyer, Mr. Hansmeier and Mr. Steele exercised de facto control over Prenda Law's activities, operations, and finances. Ind. ¶ 25. The defendants also allegedly used a number of sham entities as nominal clients to act as strawman holders of various copyrights that the defendants had procured. Ind. ¶ 26. These entities included AF Holdings, Ingenuity 13, Guava, Livewire Holdings, and LW Systems. Ind. ¶ 26. According to the indictment, each of these was really controlled by the defendants. Ind. ¶ 26. The indictment also asserts that the defendants never distributed or commercially released the movies at issue, but instead had the movies uploaded to BitTorrent sites in order to pursue settlements based on meritless copyright infringement claims. Ind. ¶ 27.

The indictment claims that the defendants began concealing their conduct through these entities because courts began blocking their efforts. Judges around the country started placing limitations on early discovery requests in the copyright infringement cases, preventing Mr. Hansmeier and Mr. Steele from obtaining the real identities associated with dozens of IP addresses at once. Ind. ¶ 29. Without this bulk ex parte early discovery, the defendants were hamstrung in their ability to easily demand settlement payments from the consumers of their pornographic movies. As a result, in the fall of 2012, the defendants allegedly began filing cases, particularly on behalf of Guava, falsely claiming their clients' computer systems had been hacked. Ind. ¶ 29. The defendants then moved for early discovery of subscriber information related to IP addresses that they claimed belonged to the potential hackers, but that were actually associated with individuals who had downloaded the defendants'

pornographic movies. Ind. ¶¶ 29-30. Indeed, the government alleges that Guava had no systems to hack, and that those cases were based on lies in their entirety. Ind. ¶ 29. The indictment also alleges that in lieu of settlement payments, Mr. Hansmeier and Mr. Steele recruited some of the individuals who had downloaded the pornographic movies to serve as pretend hackers in those cases. Ind. ¶ 31. These individuals would consent to early discovery being served on Internet Service Providers to uncover the identities of other downloaders who were fraudulently identified as their "co-conspirators" in the alleged hacking. Ind. ¶ 31. Once courts started scrutinizing the defendants' litigation strategies, they allegedly began inducing participants in the scheme to lie under oath and providing misleading testimony about their actions. *See, e.g.*, Ind. ¶¶ 32, 33(a), (b), (d), (e), (f), (i), (j), (k).

In addition to the mail and wire fraud conspiracy count, the indictment also alleges that the defendants engaged in five counts of mail fraud, ten counts of wire fraud, and conspiracy to commit money laundering. Ind. ¶¶ 36, 38, 40. These individual instances are part of the broader fraud scheme, but they also serve as standalone criminal counts. All told, the indictment alleges that the conspiracy generated more than $6 million in ill-gotten gains. Ind. ¶ 34.

## II.   Analysis

Mr. Hansmeier has moved to dismiss most of the indictment against him, arguing that the scheme the government describes does not constitute fraud, and therefore all of the counts that rely on the illegality of the scheme are invalid. Essentially, Mr. Hansmeier argues: (1) actions taken in civil litigation cannot form the basis of fraud charges, and (2) the allegations in the indictment describe nothing more than an aggressive and controversial approach to copyright litigation. However, not only does the indictment adequately describe an unlawful fraudulent scheme, but none of Mr. Hansmeier's arguments about the flaws in the indictment withstand scrutiny.

### A.   Legal Standard: Federal Rule of Criminal Procedure 12(b)(3)(B)

"An indictment is sufficient if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution." *United States v. Huggans*, 650 F.3d 1210, 1217 (8th Cir. 2011) (citing *United States v. Summers*, 137 F.3d 597, 601 (8th

4

Cir. 1998)). And an indictment is generally sufficient "unless it is so defective that it cannot be said, by any reasonable construction" to charge the offense at issue. *United States v. Hayes*, 574 F.3d 460, 472 (8th Cir. 2009) (internal quotation marks omitted).

"In reviewing the sufficiency of an indictment, [the Court must] accept the government's allegations as true, without reference to allegations outside the indicting document." *United States v. Farm & Home Sav. Ass'n*, 932 F.2d 1256, 1259 n.3 (8th Cir. 1991). As a result, a motion to dismiss is not the appropriate vehicle to challenge the veracity of the facts alleged or to critique the strength of the government's theory of the case. The indictment need do no more than set forth the charges and enough facts, if proven beyond a reasonable doubt, to support them.

### B. Reviewing the Indictment as a Whole

A fraudulent scheme alleged in any indictment must be viewed as a whole. Mr. Hansmeier's motion presents the government's many allegations as a list of discrete acts which are not all, on their own, illegal in an attempt to argue that the entire indictment fails to set forth a criminal conspiracy. *See, e.g.*, Def.'s Mem. at 37-48, ECF No. 49; Transcript of Motion Hearing ("Tr.") at 58:1-5, ECF No. 65 (defense counsel discussing various portions of the alleged fraud scheme and arguing that "[i]f the parts [of the indictment] are invalid, the whole cannot be valid"). By dissecting the allegations, Mr. Hansmeier asks the Court to look at the potential illegality of each constituent element in isolation, rather than at the indictment and alleged scheme as a whole. For two reasons, this approach is flawed.

First, indictments generally must be viewed in their totality. An "indictment should be: (1) read as a whole; (2) read to include facts which are necessarily implied; and (3) construed according to common sense." *United States v. Afremov*, No. 06-cr-196(JRT/SRN), 2007 WL 3237630, at *15 (D. Minn. Oct. 30, 2007); *see also United States v. Schmitz*, 634 F.3d 1247, 1259 (11th Cir. 2011); *United States v. Palumbo Bros.*, 145 F.3d 850, 860 (7th Cir. 1998); *United States v. Buckley*, 689 F.2d 893, 899 (9th Cir. 1982). This requirement is even more important in reviewing conspiracy allegations. "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (quotation marks omitted). And "it is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Id.* at 707.

5

Second, because a fraud scheme is at issue in this case, the requirement to view the allegations as a whole is even more critical. To prove mail or wire fraud, the government must show: (1) the defendant voluntarily and intentionally devised or participated in a scheme to defraud another out of money, property, or property rights; (2) the defendant did so with the intent to defraud; and (3) the defendant used, or caused to be used, the mail or interstate wire communication in furtherance of some essential step in the scheme. *See United States v. Onwumere*, 530 F.3d 651, 653 (8th Cir. 2008) (elements of mail fraud); *United States v. Farrington*, 499 F.3d 854, 859 (8th Cir. 2007) (elements of wire fraud); *see also* Judicial Comm. on Model Jury Instrs. for the 8th Cir., *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit* ("*Jury Instrs.*") 389-407(2014 ed. rev.).[2]

Because the mail and wire fraud statutes criminalize a scheme that is accompanied by fraudulent intent, rather than prohibiting individual discrete acts, the Court must focus on the indictment broadly to determine whether it describes an offense that satisfies these elements. "Scheme to defraud" has been characterized as "a departure from fundamental honesty, moral uprightness, or fair play in candid dealings in the general life of the community." *United States. v. Sheahan*, 31 F.3d 595, 600 (8th Cir. 1994) (quoting *United States v. Britton*, 9 F.3d 708, 709 (8th Cir. 1993) (per curiam)) (defining scheme to defraud in a bank fraud case); *see also United States v. Schmitz*, 634 F.3d 1247, 1259 (11th Cir. 2011) (mentioning importance of reading indictment for mail fraud "as a whole"); *cf. United States v. Yefsky*, 994 F.2d 885, 894 (1st Cir. 1993) (indicating that "it makes sense to read a conspiracy indictment as a whole when the substantive offenses also are the objects of the conspiracy" in the mail fraud context); *United States v. Poliak*, 823 F.2d 371, 372 (9th Cir. 1987) (discussing the importance of looking at the entire scheme in determining which acts are sufficient to form the basis of discrete in mail fraud context). Indeed, Mr. Hansmeier points the Court to no authority to undermine such a holistic review.

---

[2] The government has also alleged an alternative theory of fraud, asserting that Mr. Hansmeier devised or participated in a scheme to "obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions." Ind. ¶ 16; *see also* Tr. 46:6-15. The requirement to review the scheme as a whole is the same for both theories of fraud, and the government need prove only one theory beyond a reasonable doubt. *See, e.g. United States v. Blumeyer*, 114 F.3d 758, 769 (8th Cir. 1997).

6

Against this backdrop, it would be inappropriate to focus only on the arguably lawful actions related to creative copyright litigation discussed in the indictment while ignoring the allegations of perjury, misleading testimony, filing cases with fictitious and bad faith claims, creating sham entities as clients, recruiting sham defendants to deflect courts' scrutiny of early discovery requests, and lying to the courts and victims about material facts. The Court must decline Mr. Hansmeier's unsupported invitation to find that each aspect of the scheme must be independently unlawful for the scheme to be fraudulent.

### C.   Fraudulent Conduct in Civil Litigation

Mr. Hansmeier's motion to dismiss is centrally premised on the idea that civil litigation activities cannot form the basis of a criminal prosecution. *See, e.g.*, Def.'s Mem. at 31, 34, 35-36. Relying largely on broad dicta in *I.S. Joseph Co. v. J. Lauritzen A/S* and *United States v. Pendergraft*, Mr. Hansmeier argues that using civil litigation conduct as part of criminal charges is prohibited because doing so would chill the public's rightful use of the courts and discourage lawful, though perhaps creative or aggressive, litigation tactics. Def.'s Mem. at 31-32; *see also I.S. Joseph*, 751 F.2d 265 (8th Cir. 1984); *Pendergraft*, 297 F.3d 1198 (11th Cir. 2002). However, this essential premise of Mr. Hansmeier's motion is unsupported. Neither of the primary cases upon which Mr. Hansmeier relies goes as far as he claims in shielding civil litigation activities, and indeed, the relevant case law undermines his assertions.

First, it is simply untrue that actions taken during civil litigation cannot form the basis of criminal charges. Federal law criminalizes any number of actions that are conducted in relation to litigation, including most obviously committing or suborning perjury. 18 U.S.C. §§ 1621, 1622. Even focusing on the narrower issue of whether civil litigation can give rise to mail and wire fraud charges, Mr. Hansmeier's broad assertion is misplaced. Numerous successful fraud prosecutions have been based, in whole or in part, on conduct that occurs in civil litigation. *See, e.g.*, *United States v. Eisen*, 974 F.2d 246, 253-54 (2d Cir. 1992) (affirming mail fraud charges based on conduct in a civil lawsuit); *United States v. Lee*, 427 F.3d 881, 890-91 (11th Cir. 2005) (same); *United States v. DeGeorge*, 380 F.3d 1203, 1218-19 (9th Cir. 2004) (affirming perjury and mail fraud convictions based on conduct in a civil lawsuit); *United States v. Goodstein*, 883 F.2d 1362, 1372 (7th Cir. 1989) (affirming mail and wire fraud convictions based on defendant's misconduct in bankruptcy proceedings); *United States v. Coven*, 662 F.2d 162, 166, 175-76 (2d Cir. 1981) (affirming mail and wire fraud convictions related to

7

an attempt to defraud federal district court and receiver in ongoing receivership proceedings).

Indeed, the Second Circuit has squarely held that civil litigation tactics, many of which are attributed to Mr. Hansmeier, can give rise to fraud allegations. *Eisen*, 974 F.2d at 253-54. In *Eisen*, attorneys and their staff were accused of manufacturing evidence, suborning perjury, and including misrepresentations in court filings. *Id.* at 253. The Second Circuit found that the defendants' lies, misrepresentations, and other dishonest behavior constituted mail fraud because they engaged in those tactics to deceive the civil defendants into settling the cases or to secure favorable jury verdicts at trial. *Id.* The fact that their actions were connected to civil litigation did nothing to immunize them from prosecution. *Id.* at 253 ("Litigants depend on the integrity of the conduct of participants in civil proceedings . . . . It is one thing to challenge the perception, memory, or bias of an opponent's witnesses; it is quite another for a party's lawyer and a witness to concoct testimony that they know has been wholly fabricated.").

Second, neither of the cases on which Mr. Hansmeier principally relies, *I.S. Joseph* and *Pendergraft*, necessitates a different outcome. Neither decision holds that civil litigation can never give rise to a fraud prosecution, and both are readily distinguishable. While both opinions raise concerns in dicta about bringing criminal charges based upon normal civil litigation activities, neither holds that fraudulent civil litigation tactics cannot contribute to allegations of mail or wire fraud.

In *I.S. Joseph*, a civil RICO case, the Eighth Circuit addressed whether the mere threat of filing an arguably meritless civil lawsuit rose to the level of extortion. The claim was based on assertions that the defendants threatened to sue the plaintiffs for failing to pay a debt they owed to the defendants. The Eighth Circuit held that the threat of civil litigation could not constitute extortion, reasoning that the extortion statute did not contemplate the sort of fear caused by a threat to sue. *I.S. Joseph*, 751 F.2d at 267. Mr. Hansmeier points to the court's closing statement that "[r]esort to a federal criminal statute is unnecessary" because tort law could provide a remedy for the wrongs alleged in the civil RICO complaint. *Id.* at 267-68. But, even if this observation was central to the holding as opposed to being dicta, the concern is plainly tied to the idea that threats to pursue civil litigation standing alone cannot form the basis of an extortion claim, not the much broader proposition that civil litigation

8

activities can never form the basis of a criminal indictment. *I.S. Joseph* simply does not go as far as Mr. Hansmeier argues.

In *Pendergraft*, the Eleventh Circuit favorably quoted the reasoning of *I.S. Joseph* in reviewing a criminal extortion charge, but based its decision that fraud had not occurred on something else entirely. 297 F.3d at 1205-07, 1209. The *Pendergraft* court examined whether the civil litigation activities in that case could appropriately form the basis of a mail fraud charge, concluding that they could not because there was no intent to deceive the alleged victims. *Id.* at 1209. The *Pendergraft* defendants filed false affidavits in a civil case, but all parties were fully aware of the falsity and everyone knew that no other parties believed the statements were truthful. *Id.* The court reasoned that there simply could not have been the requisite intent to deceive under those circumstances. *Id.*

Mr. Hansmeier relies on *Pendergraft* to support his expansive assertion that civil litigation activities cannot form the basis of a criminal indictment, and certainly the *Pendergraft* decision includes language expressing concern over criminalizing civil litigation conduct. *Id.* at 1207 ("[W]e are troubled by *any* use of [extortion charges] to punish civil litigants. . . . Allowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another. The reality is that litigating parties often accuse each other of bad faith. The prospect of such civil cases ending as criminal prosecutions gives us pause." (emphasis in original)). However, the Eleventh Circuit has since explained its decision and significantly narrowed its reach. *Lee*, 427 F.3d at 888-91. In *Lee*, the court made clear that the *Pendergraft* decision rested solely on the lack of intent to deceive rather than the policy concerns discussed in the opinion. *Id.* at 890. The *Lee* court then affirmed mail fraud convictions where the criminal defendants had used the trappings and processes of civil litigation in trying to deceive a bank into discharging a debt they owed. *Id.* at 891.

Taken together, these decisions demonstrate that civil litigation activities can give rise to criminal charges. Certainly, the case law and common sense both caution that to support a fraud charge, such conduct must go well beyond ordinary lawyering techniques and must be undertaken with an intent to deceive a party into parting with

9

something of value.[3] But it is simply untrue that conduct such as that alleged in this case cannot be part of a fraudulent scheme simply because it was related to civil litigation.

### D.  False Statements and Material Omissions in the Indictment

Mr. Hansmeier also argues that the indictment is fatally flawed because it does not describe definitive lies or omissions made in the face of a certain duty to disclose. This argument also fails for several reasons. Not only does the indictment allege many false statements, but it is beyond dispute that a fraud scheme can be charged even absent an allegation of specific falsehoods.

First, the indictment alleges several outright false statements as part of the fraudulent scheme. As the Second Circuit discussed in *Eisen*, manufacturing evidence and committing or suborning perjury in civil cases can readily give rise to fraud charges. 974 F.2d at 253-54. Here, Mr. Hansmeier stands accused of precisely that conduct. The indictment alleges, for instance, that Mr. Hansmeier falsely claimed his clients were hacked when they had no computer systems that could have been hacked, Ind. ¶¶ 29, 33(b); that he filed an intentionally misleading declaration "signed under penalty of perjury" claiming he had never uploaded any of his clients' copyrighted material to a BitTorrent file-sharing website, Ind. ¶ 33(k); that he caused others to lie about his relationship to his sham clients, Ind.¶ 33(a), (i), (j); and that he manufactured strawman defendants to smooth the way on early discovery requests, Ind. ¶ 31. And unlike *Pendergraft*, the victims of Mr. Hansmeier's lies and misrepresentations had no way of knowing they were being lied to; they had no involvement in bringing the civil

---

[3]   While courts certainly have a strong interest in ensuring that the public has access to the judicial system, courts also have an interest in deterring truly fraudulent litigation. Because the allegations in this case go beyond normal litigation tactics and the indictment sufficiently alleges a fraudulent scheme, the Court does not share Mr. Hansmeier's concern that this prosecution will chill legitimate civil litigation. Mr. Hansmeier stands accused of manufacturing evidence, committing and suborning perjury, and filing cases that were in some instances entirely fraudulent, all in an attempt to extract settlement payments from victims who knew nothing of Mr. Hansmeier's alleged attendant lies and misleading actions. The indictment simply does not raise the serious policy concerns that criminalizing civil litigation in other contexts might.

lawsuits and there had been no discovery that might have made them aware of the falsity of the allegations in the civil cases. The whole scheme was geared toward extracting settlement payments, and the cases were usually dropped when parties sought to litigate the claims. Ind. ¶ 17. Mr. Hansmeier overlooks these clear allegations of lies and falsehoods in an effort to characterize the indictment as criminalizing mere omissions, but the Court cannot join in such a narrow focus.

Second, even if Mr. Hansmeier were right in asserting that the indictment lacks sufficient allegations of outright lies or false statements, "a scheme to defraud does not require false representations." *United States v. Steffen*, 687 F.3d 1104, 1111 (8th Cir. 2012). The indictment asserts that Mr. Hansmeier engaged in both a scheme to defraud and a scheme to "obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions." Ind. ¶ 16. The former does not require allegations of false representations, though, as discussed, the indictment clearly contains them.

Third, the indictment includes allegations of other behavior throughout the scheme to defraud that may not constitute outright falsehoods, but that nonetheless supports the fraudulent scheme. This conduct includes causing Mr. Hansmeier's clients' pornographic movies to be uploaded to Pirate Bay in a way that undermined the validity of any eventual lawsuit, but asserting that the subsequent downloads were done "without authorization," Ind. ¶¶ 20, 22; misrepresenting that he intended to prosecute copyright infringement cases against the "John Doe" defendants once their identities were discovered, Ind. ¶ 17; establishing entities in other individuals' names to serve as "clients" in various civil lawsuits while retaining control over those entities' operations and finances, Ind. ¶¶ 13-14, 25, 26(a)-(d); and failing to share any of that information with courts while seeking court orders that ultimately allowed the identification of targets for settlement, Ind. ¶¶ 17, 22-24. The Court need not decide whether Mr. Hansmeier had a clearly established duty to disclose his role in uploading the movies to Pirate Bay or his personal stake in the outcome of the civil litigation, nor whether these allegations standing alone would support criminal charges.[4] At a

---

[4] The parties spend significant space in their briefing debating the question of whether rules of professional conduct governing lawyers on their own can create a duty to disclose information such that an ethics violation itself could constitute a material omission for criminal fraud purposes. *See, e.g.*, Def.'s Mem. at 42-48; Resp. at
*(footnote continued on next page)*

minimum, these alleged activities are intrinsically intertwined with the fraud scheme and their non-disclosure can reasonably be understood as evidencing an intent to defraud.

### E. Mr. Hansmeier's Other Arguments

Mr. Hansmeier briefly raises two other arguments that merit discussion. First, he argues that he has been punished enough for his actions through the civil sanctions imposed by courts around the country and the suspension of his license to practice law, and therefore the charges should be dismissed. Def.'s Mem. at 51. However, the availability, and even imposition, of lesser non-criminal sanctions does not undermine the validity of the allegations in the indictment. *See Afremov*, 2007 WL 3237630, at *16. Our adversarial system vests the government, not the Court, with the authority to determine whether to bring criminal charges when civil remedies are also available. *See, e.g.*, *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248 (1980) (indicating that prosecutorial discretion permits prosecutors "to be zealous in their enforcement of the law" and to determine what sort of available sanctions to pursue). Mr. Hansmeier's suggestion that the Court should express disapproval regarding the government's decision to prosecute by dismissing the indictment is without merit.

Mr. Hansmeier's also argued in passing in his brief that a lie or material omission to one party that induces another party to part with her money or property cannot constitute fraud. This argument, though superficially appealing, is contrary to controlling Eighth Circuit precedent. *Blumeyer*, 114 F.3d at 768 (indicating that false representations made to a regulatory agency as part of a scheme to obtain money or property from other victims can constitute fraud); *see also Eisen*, 974 F.2d at 253 (indicating false evidence offered during civil litigation "works a fraud not only on the jury but on the opposing party as well"). The fact that many of the lies and material misrepresentations mentioned in the indictment were made to the courts rather than solely and directly to the victims does not undermine the sufficiency of the allegations.

---

21-24; Reply at 6-7. The Court need not answer this interesting question in resolving the motion to dismiss because of the ample allegations of fraudulent conduct that arise from actions unrelated to Mr. Hansmeier's ethical obligations.

### III.   Conclusion

Mr. Hansmeier's motion to dismiss purports to raise interesting questions about how far the government can go to criminalize aggressive civil litigation tactics. But the indictment against him alleges clearly fraudulent behavior that goes far beyond creative lawyering, so the novel questions he has raised need not be answered in this case at this stage. Ultimately, the indictment contains sufficient allegations to establish conspiracy to commit mail and wire fraud, mail fraud, wire fraud, and money laundering if those allegations are proven beyond a reasonable doubt at trial.

### Recommendation

Based on the foregoing, the Court **HEREBY RECOMMENDS** that Mr. Hansmeier's Pretrial Motion to Dismiss, ECF No. 48, be **DENIED**.

Date: July 24, 2017                                  s/ *Katherine Menendez*
                                                                    Katherine Menendez
                                                                    United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.