BP-A148.055
SEP 98

**INMATE REQUEST TO STAFF**

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) Warden | DATE: 11/16/21 |
|---|---|
| FROM: Hansmeier | REGISTER NO.: 20953-041 |
| WORK ASSIGNMENT: Educ 12-4pm | UNIT: K3 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.

I am requesting a reduction in sentence based on the following factors: (1) hardship during COVID-19 modified operations; (2) family issues; (3) health concerns from COVID-19 infection including a high BMI; (4) constitutional violations and ethical breaches by the Government in my criminal case; (5) my rehabilitation and good deeds during my term of imprisonment; (6) unlawful First Amendment retaliation I've experienced during my term of imprisonment; and (7) other factors the BOP might consider in connection with this request.

(Do not write below this line)

DISPOSITION:

RECEIVED BY MAIL
JAN 06 2022
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

SCANNED
JAN 06 2022
U.S. DISTRICT COURT MPL

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER

**SECTION 6**

# Modified Chapel & Reentry Schedule - FCI Sandstone
## Updates Effective Sunday, November 28, 2021

- Much effort has been put into avoiding conflicts among Chapel, Recreation, Education, and other considerations. We will update continually to work out conflicts.
- Mrs. Mortenson will be available on weekdays. If you are unable to see her on your chapel days, please contact her and arrangements will be made.
- Be ready for your timeslot.
- TVs and Chapel Library will be available
- Because there are many religious groups represented in each unit and limited space, there will be no group-specific services. For example, there will be no separate Protestant service or Catholic service or Wiccan service.
    - The large and small chapels will be available for study, prayer, meditation, reflection.
    - Respect for other religious groups is expected
    - Based upon attendance on a particular day, Chaplains may work with inmate group liaisons to allocate space for group discussion or prayer. This is not guaranteed.
    - Out of respect for other inmates and limited resources, there will be no ritual items such as candles, incense, smudging, etc.
    - There will be no make-ups if the time for your unit is canceled.
    - As is well known by now, everything is subject to change at any time.

|               | Sunday | Monday | Tuesday | Wednesday | Friday |
|---------------|--------|--------|---------|-----------|--------|
| 8:45-10:00am  |        |        | H       |           |        |
| 11:45am-1:00pm|        | K4     | C       | K1        | K1     |
| 1:00-2:15pm   | A      | K3     | K3      | K4        | I      |
| 2:15-3:30pm   | J      | A      |         | I         | C      |
| 6:00-7:15pm   | K2     |        | J       |           | K2     |
| 7:15-8:30pm   | H      |        |         |           |        |

HANSMEIER, PAUL  20953041

Exhibit D

# FCI Sandstone COVID-19

### *Recreation Schedule*

This is a tentative recreation schedule for the week of December 27 to January 2, 2021. <u>This schedule is subject to change with little or no notice.</u> Only the UNITS at the selected times are permitted to go to Recreation. Please keep in mind the importance of social distancing. You must wear a mask at all times, and you may not be in a group larger than 10. All leagues and classes in Recreation are still postponed. Basketballs, bocce balls, pickle balls, soccer balls, guitars and horseshoes will be issued out for the time being. Keep in mind the importance of stretching and to try and limit any injuries from sports or equipment. The use of the weight piles and the pool tables is for those units that score 80% or above on inspections ONLY. You must follow the posted rules and regulations. The Hobby Craft room will be open. The Music room is closed. Handball will be permitted on the Recreation Yard ONLY. Recreation will consist of INSIDE ONLY at 7:45 am and both INSIDE and OUTSIDE Recreation from 11 am thru 7:10 pm. Hobby Craft Mail-outs will be conducted on Monday, December 27th for C, K1, and K4 Units. On Tuesday December 28th for A, H, I, K3 and K2. On Wednesday, December 29th for J Unit. All mail-outs are <u>only</u> at your scheduled Recreation times. These times are highlighted. Be advised that channel 30 is now BBCA, 11 is HLN and 46 is Animal Planet. All units have weights this week.

|  | MON | TUE | WED | THU | FRI | SAT | SUN |
|---|---|---|---|---|---|---|---|
| 7:30-8:30 AM INSIDE ONLY |  | H | K1 |  | K3 | A | J |
| 8:35-9:35 AM INSIDE ONLY | C | K3 | K2 | I | A | K4 | K1 |
| 11:15-12:15 PM |  | A | C | A |  | H | H |
| 12:25-1:25 PM | K1 | K2 | K4 | K3 | K1 | I | K2 |
| 1:35-2:35 PM | K4 | K4 | J | C | I | K2 | C |
| 5:00-6:00 PM |  | I | K3 | J |  |  |  |
| 6:10-7:10 |  | J |  | H |  |  |  |

HANSMEIER, PAUL 20953041

Exhibit C

# FCI Sandstone Education GED/ESL Classes & Leisure/Law Library Services

*Effective Sunday December 5, 2021*

| TIME | Sunday | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY |
|---|---|---|---|---|---|---|
| 7:30-9:30 | A-Unit | K1-Unit | K1-Unit | A-Unit | I-Unit | I-Unit |
| 11:30-1:30 | J-Unit | K4-Unit | K4-Unit | J-Unit | K2-Unit | K2-Unit |
| 1:30-3:30 | H-Unit | B-Unit | B-Unit | H-Unit | K3-Unit | K3-Unit |

Exhibit B

HANSMEIER, PAUL  20953041

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

---

ties has been greatly undermined during the pandemic. Second, Hansmeier expects to be an active participant in the courts for the remaining term of his imprisonment. Practically speaking, Hansmeier has no access to the law library or other legal materials. Hansmeier's ability to litigate the important issues presented by prosecutors' efforts to criminalize ordinary, but unwanted, litigation is materially impaired by his imprisonment. Third, Hansmeier has used his time in prison to better his fellow inmates. Hansmeier served as a GED tutor and helped a large number of his fellow inmates---including inmates who had struggled to obtain their GED at other institutions---obtain their GED, which has provided them with a sense of dignity and increased their employment opportunities upon release. Finally, the public interest favors Hansmeier's release. The public interest favors open and safe access to the courts and Hansmeier's continuing imprisonment is a symbol that undermines public confidence in the courts.

The Court should grant Hansmeier's motion.

II. Background.

This background section discusses Hansmeier's criminal proceedings, Hansmeier's experience in the Bureau of Prisons during the COVID-19 pandemic and the unlawful retaliation that the Bureau of Prisons inflicted on Hansmeier.

   A. Hansmeier's Criminal Proceedings.

Hansmeier is an attorney who represented clients in enforcing their copyrights against Internet-based infringement. Hansmeier's team would monitor known piracy websites and record the Internet Protocol Addresses ("IP Addresses")--i.e. the numerical label assigned by an Internet Service Provider--used to download his clients' copyright-protected works. However, Hansmeier could not associate an identity with the IP address. That would require obtaining subscriber information from the infringer's Internet Service Provider.

Thus, Hansmeier filed civil lawsuits in federal district courts against "John Doe." From there, Hansmeier filed a motion asking the court to order John Doe's internet service provider to disclose John Doe's identifying information. In these motions, Hansmeier discussed the factors ordinarily considered by courts in connection with such requests, e.g., Arista Records LLC v. Doe 3, 604 F.3d 110, 119 (2d Cir. 2010), but did not discuss anything else, including his investigative methods or financial interest in the outcome of the case.

Hansmeier then used this information to direct communications to the infringer, stating the circumstantial case for the infringer's civil liability under the Copyright Act and offering to resolve the matter in exchange for a financial sum. In many cases, the infringer agreed to the proposed settlement in lieu of further civil litigation. This copyright enforcement method has survived appellate court scrutiny. See Killer Joe Nevada, LLC v. Does 1-20, 807 F.3d 908 (8th Cir. 2015).

Early on in his copyright enforcement practice, Hansmeier tweaked this copyright enforcement method by instructing his investigator to upload his clients' works to piracy websites instead of waiting for third parties to do so. By doing so, Hansmeier was able to catch infringers from the time the work was available on the website versus missing the infringers who downloaded the work before the investigator discovered a file that had been posted. This investigative method is supported by Eighth Circuit precedent. See Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345 (8th Cir. 1994) (ordering judgment to be entered in favor of copyright holder whose investigator made works available to suspected infringers in order to induce infringement). Indeed, this investigative method has been described as "routine." 4-13 Nimmer on Copyright 13.09[B] ("Use of ... undercover investigators and the like to ferret out infringement is routine, and provides no defense.").

Finally, Hansmeier helped create claim assertion entities---i.e., entities that aggregate intellectual property for the purpose of asserting infringement claims. These clients were clients of Hansmeier's law firm, though prosecutors allege that Hansmeier was the de facto owner of these entities. Claim assertion entities are common plaintiffs in intellectual property litigation because they offer litigation advantages over operating companies, e.g., they are not typically susceptible to counterclaims and they have no operations to be interrupted by the burdens of discovery.

Based on the above actions, the government charged Hansmeier with mail fraud, 18 U.S.C. 1341, and wire fraud, 1343, as well as conspiracy to commit said offenses and a derivative money laundering count.

[intentionally left blank]

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

---

FROM: 20953041
TO:
SUBJECT: 3582 Motion - 02 - Crim. Pro.
DATE: 12/30/2021 08:07:25 AM

The indictment erroneously claimed that Hansmeier's copyright infringement claims were meritless. It stated:

"The defendants then uploaded movies to file-sharing websites hoping to lure people into downloading their movies. When HANSMEIER and STEELE ensnared someone in their trap, they filed false and deceptive copyright infringement lawsuits that concealed their role in distributing the movies, as well as their significant personal stake in the outcome of the litigation." Dkt. 1 at para. 17;

"Thus, defendants knowingly caused their clients' movies to be shared and distributed on BitTorrent websites, and thereby purposely allowed and authorized the BitTorrent users to obtain their clients' movies." Dkt. 1 at para. 20;

"Thereafter, despite colluding in the purported infringement of of their clients' copyrights, HANSMEIER and STEELE caused lawsuits to be filed disingenuously alleging that the individuals who purportedly downloaded the movie did so 'without authorization' or consent from the copyright holder or its agents." Dkt. 1 at para. 21;

"[O]n or about April 29, 2011, the defendant filed an "ex parte" motion seeking to obtain early discovery ... and therein falsely and misleadingly represented to the court that the John Does' 'without authorization[] used an online peer-to-peer ('P2P') media distribution system to download Plaintiff's copyrighted works to the public ... by making Plaintiff's copyrighted works available for distribution to others." Dkt. 1 at para. 22;

"[C]aused to be filed ex parte motions for early discovery that failed to disclose their involvement in uploading the copyrighted movies and falsely accused the purported downloader of obtaining the movie without authorization or consent. Courts throughout the country, relying on the false and misleading representations made or caused to be made by the defendants, granted early discovery." Dkt. 1 at para. 23; and

"Defendants falsely represented to the subscribers that they and their clients had legitimate copyright infringement claims against the subscriber when, in fact and as defendants knew, they had uploaded to the BitTorrent website the very movie that they now threatened to use the subscriber for downloading." Dkt. 1 at para. 24.

These allegations were misstatements. Under Olan Mills and decisions that followed it, a copyright holder may make works available to prospective infringers without risking an authorization defense.

Hansmeier brought a motion to dismiss the indictment's fraud charges for failure to state a legally-viable theory of the charged offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v). In that motion, Hansmeier corrected prosecutors' misunderstanding of copyright law. Instead of correcting their material misstatements, prosecutors concealed the Eighth Circuit's decision in Olan Mills, notwithstanding their professional duty to disclose that they were taking positions that conflicted with Eighth Circuit precedent. Prosecutors continued to repeat their material misstatements regarding the merits of Hansmeier's claims for copyright infringement and falsely accused Hansmeier of concealing information that was required to be disclosed to the courts.

The magistrate judge recommended that the motion to dismiss be denied, reasoning that the misrepresentations and omissions alleged in the indictment satisfied the materiality requirement of the mail and wire fraud statutes. The magistrate judge's report and recommendation was heavily influenced by the prosecutors' misstatements. Over objection, the Court adopted the recommendation of the magistrate judge and denied Hansmeier's motion to dismiss.

Prosecutors then engaged in an extensive campaign of repeating their material misstatements to prospective witnesses in Hansmeier's cases including attorneys who had worked with Hansmeier, federal district court judges whom prosecutors were grooming as witnesses and other individuals who were associated with Hansmeier during the time when he practiced copyright law.

Hansmeier entered a conditional plea under Federal Rule of Criminal Procedure 11(a)(2), reserving the right to appeal the district court's ruling on the motion to dismiss. Prosecutors continued making the material misrepresentation that Hansmeier's copyright infringement claims were meritless. These material misrepresentations surfaced in the presentence investigation report, the government's sentencing memorandum and in the restitution litigation.

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

----

The Court sentenced Hansmeier to a 168 month term of imprisonment and sentenced Hansmeier's codefendant to a 60 month term of imprisonment.

In his opening appellate brief, Hansmeier once again corrected prosecutors' misunderstanding of copyright law. Regrettably, prosecutors once again resorted to material misstatements and omissions regarding the merits of Hansmeier's copyright infringement claims. Prosecutors stated, "Hansmeier's [uploading] conduct impliedly authorized the downloading of seeded movies." Resp. Br. at 4; "Each of those lawsuits was fraudulent." Resp. Br. at 5-6; "[S]eeding the materials impliedly authorized the downloading of those materials." Prosecutors also continued making the false claim that courts dismissed Hansmeier's copyright infringement claims once they became aware of Hansmeier financial interest in the claims and of Hansmeier's investigative methods.

Hansmeier provided prosecutors with an opportunity to correct their misstatements of law. In a letter sent to prosecutors and which was filed with the Eighth Circuit, Hansmeier notified prosecutors of their misstatements and their professional obligation to offer a correction. Prosecutors took no action. Indeed, at oral argument, prosecutors repeated their lie that Hansmeier's investigative methods gave rise to an authorization-related defense.

The Eighth Circuit Court of Appeals affirmed. In its decision, the court of appeals interpreted the indictment as alleging two separate schemes to defraud. The first scheme involved Hansmeier's copyright infringement claims. The second scheme involved so-called "hacking" claims.

Regarding the copyright infringement claims, the court of appeals held that the misrepresentations and omissions alleged in the indictment qualified as an actionable "scheme to defraud" under the mail and wire fraud statutes. The court of appeals held that Hansmeier's omissions met the materiality requirement under the mail and wire fraud statutes because they concealed the invalidity of Hansmeier's claims. The court of appeals was particularly taken by prosecutors' false allegation that Hansmeier faced dismissal of his lawsuits and sanctions when courts learned about Hansmeier's investigative tactics/ownership.

The decision stated:

"Had the courts known that Hansmeier intentionally posted the films on websites used for illegal file sharing or that [defendants] were in fact the personal beneficiaries of their clients' copyright claims, they would have treated the subpoena request with far greater skepticism---indeed, the indictment alleges that [Hansmeier] faced dismissals of [his] lawsuits and sanctions when the extent of [his] involvement eventually came to light."

Hansmeier's request for Supreme Court review was denied on October 6, 2021 and the mandate has been returned to this Court.

[intentionally left blank]

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C
---

FROM: 20953041
TO:
SUBJECT: 3582 Motion - 03 - Constitutional/Retaliation
DATE: 12/30/2021 08:49:07 AM

B. Hansmeier Experiences Unlawful Retaliation Based on His Petitioning Activity.

On June 1, 2021, Hansmeier served the United States Attorney for the District of Minnesota with complaints asserting as-applied challenges to the federal mail fraud and wire fraud statutes and the Hobbs Act. The complaints allege that Hansmeier seeks to aid and encourage people with disabilities to enforce their rights under the Americans With Disabilities Act, but that Hansmeier is chilled from doing so by the fact that he was threatened with criminal prosecution for participating in this activity in the past. Specifically, during the criminal proceedings regarding Hansmeier's copyright enforcement cases, the United States Attorney for the District of Minnesota threatened to bring additional charges against Hansmeier based on Hansmeier's representation of people with disabilities in enforcing their rights under the Americans With Disabilities Act. This is true even though Hansmeier, to his knowledge, is the only attorney in Minnesota's history to take an Americans With Disabilities Act architectural barrier case to trial, prevail and defend the judgment on appeal. The United States Attorney's issue with Hansmeier's Americans With Disabilities Act cases was that Hansmeier was associated with "tester" plaintiffs. The United States Attorney's position was that "tester" plaintiffs should not be able to claim standing to seek removal of architectural barriers. This argument was repeatedly raised and rejected in Hansmeier's cases and has been repeatedly raised and rejected in Americans With Disabilities Act cases nationwide; to Hansmeier's knowledge, every appellate court to consider the argument, including the Eighth Circuit, has rejected the argument that so-called "testers" are less entitled to standing. But since Hansmeier was convicted of fraud for engaging in copyright enforcement activity that learned treatises characterize as "routine", Hansmeier has to take the United States Attorney's threat seriously.

The United States Attorney's office apparently complained to Sandstone Federal Correctional Institution officials, who started engaging in retaliation on June 2, 2021. On June 7, 2021, Hansmeier was subjected to administrative detention and placed "under investigation," where he would remain for the next five months. Administrative detention is a very challenging environment, which is why prison officials use it for retaliatory purposes. Administrative detainees are placed in a tiny windowless cell with another inmate, where they sit for 23 hours a day in their underwear. Administrative detainees have no access to newspapers, magazines, e-mail, or anything else other than paper and a four inch flexible pen and whatever books happen to be on the book cart. In terms of family contact, administrative detainees are prohibited from receiving visits and are limited to one phone call per month. Though administrative detainees are allowed access to mail, outgoing letters are heavily delayed. Administrative detainees are supposed to be able to access their legal materials, but Hansmeier was unlawfully denied access to his.

The conditions in administrative detention are so challenging that Bureau of Prisons protocol requires staff to make suicide checks every 30 minutes. Notwithstanding this rigorous protocol, at least one Sandstone inmate managed to commit suicide in administrative detention this year. Hansmeier estimates that he underwent 8,640 suicide checks during his time in administrative detention. Because administrative detention is such a challenging environment, its use is heavily regulated. Federal regulations limit administrative detention's legitimate use to circumstances where specific and objective evidence shows that an inmate poses a "serious threat" to self, others or the orderly operation of the institution. According to federal regulations, inmates are entitled to several layers of due process protections, including being provided with the basis for administrative detention, weekly staff reviews concerning an inmate's continuing administrative detention and the right to attend these reviews. Hansmeier was provided with none of this. Hansmeier's administrative detention order stated only that Hansmeier was "under investigation," and did not provide any objective evidence demonstrating why Hansmeier needed to be detained during this so-called investigation. Hansmeier was not allowed to attend any of the staff meetings concerning his continuing administrative detention.

Ultimately, as it would turn out, Hansmeier was administratively detained so Bureau of Prisons officials, who have no training in the law, could investigate Hansmeier's petitioning activity. Bureau of Prisons officials charged Hansmeier with fraud and extortion and referred Hansmeier for criminal prosecution based on his assertion of "as applied" constitutional challenges to the mail fraud and wire fraud statutes and the Hobbs Act. The United States Attorneys' office apparently believed that a criminal prosecution based on Hansmeier's constitutional claims might be a bridge too far and declined to prosecute. Hansmeier prevailed against the fraud and extortion charges via the Bureau of Prisons' administrative process.

Hansmeier has filed a lawsuit to address this serious violation of his civil rights, Hansmeier v. Fikes, 21-cv-1979 (PAM/DTS) (D. Minn.). These circumstances constituted an egregious violation of Hansmeier's constitutional right to petition the courts for relief.

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

----------------------------------------------------------------------------------

The unlawful retaliation described above continues to this day. Since Hansmeier was released from administrative detention in early November, one of the defendants to Hansmeier's claims stopped by Hansmeier's cube to try and intimidate him. The defendants to Hansmeier's claims have further decided to interfere with Hansmeier's communications. Among the communications they have blocked on "institutional security" grounds were communications aimed at finding a Minnesota First Amendment attorney and communications directed at obtaining United States District Court Judge Paul A. Magnuson's practice pointers and preferences. Prison officials have thus demonstrated through their actions that they cannot be trusted to defend inmates' First Amendment rights.

[intentionally left blank]

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

---

FROM: 20953041
TO:
SUBJECT: 3582 Motion - 04 - COVID-19
DATE: 12/30/2021 07:33:08 PM

C. Hansmeier's Experience in the Bureau of Prisons During the COVID-19 Pandemic.

1. Hansmeier's COVID-19 Infections.

In early-2020, inmates at Sandstone Federal Correctional Institution started developing COVID-19 symptoms, including extreme fatigue, a dry cough, loss of appetite and respiratory pain. Sandstone officials took action by establishing a quarantine unit. At the time, the housing units at Sandstone were filled to capacity so there was no empty housing unit in which to establish the quarantine unit. Sandstone officials instead emptied the tables and exercise equipment from the game room in Hansmeier's housing unit and installed bunkbeds in that room. Inmates with COVID-19 symptoms were quarantined in that room. This setup exposed inmates in Hansmeier's housing unit to infection, as the inmates in the quarantine room were on a common air system and shared common facilities with inmates in the general housing unit. For example, quarantined inmates shared bathroom facilities and kitchen facilities with inmates in the general housing unit. Staff members would not even enter Hansmeier's housing unit without first donning full personal protective equipment.

Unsurprisingly, the inmates in Hansmeier's housing unit, including Hansmeier, quickly contracted COVID-19. Hansmeier was infected in February/March of 2020. Hansmeier experienced extreme fatigue, a dry cough and a loss of appetite. In addition to these symptoms, Hansmeier experienced blackouts. During a stand up count, Hansmeier lost consciousness and fell to the floor. Hansmeier was fortunate not to hit his head on his metal locker, his metal bed, the concrete walls of his cube or the concrete floor. Had he done so, Hansmeier would have risked suffering permanent brain injury. Hansmeier was taken to medical for tests and observations following that incident.

Sandstone FCI experienced a second widespread COVID-19 outbreak in November 2020. During that outbreak, Sandstone officials were forced to move inmates from infected units into units that were free of infection. Unsurprisingly, COVID-19 quickly overran the compound and Hansmeier was infected for a second time. One inmate lost his life during the second wave of COVID-19 at Sandstone. Hansmeier experienced symptoms, but his symptoms were not as severe as those he experienced during his first COVID-19 infection.

Hansmeier has no ability to protect himself against yet another round of COVID-19 infection. Once a staff member with COVID-19 brings COVID-19 into Sandstone's facilities, widespread infection is inevitable, as history has shown. Inmates at Sandstone are housed in a dormitory style environment where social distancing is impossible and mask use is inconsistent. Once inmates start to become infected, Bureau of Prisons' protocol requires Sandstone staff to move inmates from infected units (i.e. inmates who tested negative for COVID-19) to units that are free of COVID-19 infection. Once the "negative" inmates get there, all of the inmates who were "false negatives" for COVID-19 infect the inmates in the healthy unit. Staff members were making bets about how soon a quarantined unit would get infected once the "false positives" moved into a healthy unit.

Hansmeier is six feet five inches and weighs 235 pounds. This puts his body mass index at 27.9. According to Centers for Disease Control guidance, individuals with a body mass index of over 25 are at a heightened risk for severe symptoms from COVID-19 infection. Hansmeier thus has a heightened risk of experiencing severe symptoms from COVID-19 infection. Hansmeier's first bout with COVID-19 is evidence of Hansmeier's susceptibility to severe symptoms from COVID-19 infection. Hansmeier is concerned about severe symptoms from future infection.

Hansmeier took the COVID-19 vaccine in June 2021. The effectiveness of the vaccine reportedly wanes over time and Hansmeier has not yet been offered a booster shot. Moreover, given the prevalence of COVID-19 variants, including the omicron variant, it is unclear what effectiveness, if any, Hansmeier's current vaccination provides against severe symptoms from future COVID-19 infection. Vaccination rates at Sandstone among the inmates and staff are far from 100%, which greatly increases the risk that an infected staff member or inmate will spread COVID-19 when they are infected.

If released, Hansmeier would be able to better manage his risk of COVID-19 infection. First, Hansmeier would be living in a home where every member of his household has been vaccinated and where social distancing is feasible. Moreover, Hansmeier would have access to the COVID-19 booster shot, testing when needed and to high quality medical care in the event of an infection.

2. Conditions at Hansmeier's Facility During the COVID-19 Pandemic.

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

---

On March 13, 2020, President Trump declared a national emergency based on the COVID-19 global pandemic. See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, the White House (March 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. On April 3, 2020, Attorney General William P. Barr exercised his emergency authority under Section 12003(b)(2) of the CARES Act, Pub. L. No. 116-136, and found that emergency conditions caused by the COVID-19 virus existed within the Bureau of Prisons. Attorney General Barr's finding caused the Bureau of Prisons to implement what it termed "modified operations."

Hansmeier is housed at Sandstone Federal Correctional Institution in Sandstone, Minnesota. At Sandstone, modified operations began with inmates being confined to their units 24 hours a day, seven days a week. Visitation with family members, religious services, educational programming, counseling services and drug abuse treatment programs, recreation/exercise and vocational-technical classes were all cancelled. Hansmeier had no access to fresh air, sunlight or exercise, no access to programming opportunities, no opportunity to attend to his spiritual needs and no opportunity to see his children, spouses, parents or friends.

Over time, Sandstone would provide inmates with incremental access to out-of-unit activities. For example, inmates were eventually allowed one hour of access to exercise opportunities per week. But any time there was an incident related to COVID-19 at Sandstone, the institution's protocols required it to revert back to the default state of confining inmates to their housing units around the clock.

Since April 1, 2020, Hansmeier has had minimal access to fresh air, sunlight and exercise, programming opportunities, and access to visitation. The conditions at Sandstone which have prevailed since April 1, 2020, are best described as human warehousing. There is no apparent end in sight to these conditions. Attached as exhibits hereto are copies of the current out-of-unit programming schedules, which include the recreation, education and chapel schedules. The Court will see that Hansmeier's housing unit, Unit K3, receives 10 hours of time outside the unit per week. This is the best that conditions have gotten since April 1, 2020.

[intentionally left blank]

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

---

FROM: 20953041
TO:
SUBJECT: 3582 Motion - 05 - Other Factors
DATE: 12/30/2021 08:55:12 AM

D. Other Factors the Court Might Weigh.

Other factors might weigh into the Court's consideration of Hansmeier's motion.

First, Hansmeier has not seen his young children in nearly two years. When the Court sentenced Hansmeier to a term of imprisonment, visiting was regularly available within the Bureau of Prisons. The Court might have held a different view towards sentencing had it known that parents would be unable to visit with their children during their term of imprisonment.

Second, prosecutors' criminalization of "routine" copyright enforcement methods and prosecutors' threats to criminalize common Americans With Disabilities Act enforcement raise substantial constitutional issues and other issues that district courts within the Eighth Circuit will be addressing for the foreseeable future. As someone who has been directly injured by these constitutionally suspect moves, Hansmeier has a uniquely strong case for standing to challenge prosecutors' actions. Hansmeier's ability to properly litigate these issues is significantly hampered by the fact that he is thrown into administrative detention whenever he tries to do so. Moreover, even when he is not in administrative detention, Hansmeier has virtually no access to legal materials. The law library is accessible to inmates for four hours per week. Hansmeier serves as a GED tutor during the hours that the law library is made available.

Third, the Court should consider Hansmeier's exemplary record as an inmate. Hansmeier has devoted much of his time as an inmate towards helping inmates obtain their GED. Hansmeier's efforts have helped inmates---including inmates who struggled to obtain their GED at other institutions---obtain their GED. These efforts have provided a benefit to society by helping these inmates have better confidence, more personal dignity and a broader array of employment opportunities when they leave prison. Hansmeier's GED efforts are essentially volunteer. His inmate pay is roughly $18 per month.

Fourth, prosecutors' actions have undermined the public's confidence in the courts. While it was always true that a person who commits perjury was theoretically subject to imprisonment, it is now the case that litigants and their attorneys can be subject to lengthy terms of imprisonment based on little more than a prosecutor's subjective belief that litigation activities are meritless---even when judicial precedent holds exactly the opposite. In Hansmeier's case, prosecutors were able to take an intellectual property enforcement method that learned treatises describe as "routine" and convert it into a fraudulent enterprise deserving of a 14 year term of imprisonment. If prosecutors can do it in Hansmeier's case, then they can do it in anybody's case. And if prosecutors can do it, then so too can private individuals through civil RICO actions, with allegations of meritless litigation activity satisying the predicate act barrier to bringing such claims. The public's access to and confidence in the court will continue to be eroded until prosecutors' actions in this case are reconciled with the law.

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

----

FROM: 20953041
TO:
SUBJECT: 3582 Motion - 06 - Argument
DATE: 12/31/2021 06:09:05 AM

III. Argument.

A prisoner seeking to reduce his term of imprisonment pursuant to 18 U.S.C. 3582(c)(1)(A)(i) must make four showings: (1) exhaustion of administrative remedies; (2) extraordinary and compelling circumstances; (3) no danger to the safety of any other person or to the community; and (4) that the 18 U.S.C. 3553(a) factors support a reduction in sentence. See, e.g., United States v. Campbell, No. CR03-4020-LTS, 2020 U.S. Dist. LEXIS 112335 (N.D. Iowa June 26, 2020). Hansmeier can make all of these showings.

 A. Exhaustion of Administrative Remedies.

A party "exhausts administrative remedies as required by 18 U.S.C. 3582(c)(1)(A) so long as his motion is filed at least 30 days after the receipt of an administrative request by his warden." Id. Hansmeier sent his administrative request to his warden on November 16, 2021. A copy of the administrative request is attached as Exhibit A hereto. Over 30 days have passed since the warden's receipt of Hansmeier's administrative request. Hansmeier has exhausted his administrative remedies.

 B. Extraordinary and Compelling Reasons.

  1. Legal Standard.

Section 3582 was originally enacted as a "safety valve" to re-assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983). The First Step Act made significant changes to Section 3582. See 18 U.S.C. 3582(c)(1)(A)(i). Now, section 3582 empowers courts to reduce a defendant's sentence after they have exhausted their administrative remedies whenever "extraordinary and compelling circumstances warrant such a reduction." Id.

This is so, because while Congress initially delegated to the U.S. Sentencing Commission the responsibility of defining "extraordinary and compelling reasons," 28 U.S.C. 994(t), it was not until 2007, more than two decades after the statute was enacted, that the Commission stated that "extraordinary and compelling reasons" include medical conditions, age, family circumstances and "other reasons." U.S.S.G. 1b1.13, comm. n.1. Now, in light of the First Step Act's objective to increase courts' abilities to grant compassionate release or otherwise reduce sentences, courts are no longer constrained by whether the Commission or the Bureau of Prisons' determination of whether a sentence reduction is appropriate.

When a prisoner exhausts his administrative remedies, the court may, upon motion of the prisoner, reduce the prisoner's sentence after considering the factors set forth in 18 U.S.C. 3553(a) to the extent they are applicable, provided the court finds that extraordinary and compelling reasons warrant such a reduction. See, e.g., United States v. Long, No. 20-3064 (D.C. Cir. May 18, 2021) ("We, like seven other circuits, hold that this policy statement is not applicable to compassionate release motions filed by defendants, and so we vacate the district court's order and remand for further proceedings."); United States v. O'Bryan, No. 96-10076-30, 2020 WL 869475, at *2 (D. Kansas Feb. 21, 2020) (agreeing with "numerous courts" that have "recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence---and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual 1b1.13 n.1(D), that is, 'an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)' relating to the prisoner's health or family relations.").

As these examples illustrate, courts, no longer constrained by the Commission and Bureau of Prisons' narrow interpretation of "extraordinary and compelling reasons," have embraced their broad discretion under 3582(c)(1)(A) to grant motions to reduce sentences. The circumstances described in this memorandum constitute extraordinary and compelling reasons to grant a reduction in sentence.

  2. Hansmeier's COVID-19 Experience Presents Extraordinary and Compelling Reasons.

Hansmeier's COVID-19 experience presents extraordinary and compelling reasons in at least two respects. First, Hansmeier faces a threat of severe complications from COVID-19 infection. Second, Hansmeier's term of imprisonment has been associated with much harsher conditions than what the Court could have reasonably anticipated at sentencing.

CASE 0:16-cr-00334-JNE-KMM   Doc. 211-1   Filed 01/06/22   Page 14 of 17

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C
--------------------------------------------------------------------------------

a. Hansmeier Faces a Threat of Severe Symptoms From COVID-19 Infection.

Courts recognize that a prisoner's susceptibility to severe symptoms from COVID-19 is an extraordinary and compelling reason for purposes of section 3582. Hansmeier has medical conditions which make him susceptible to server symptoms from COVID-19 infection. Moreover, Hansmeier has already experienced severe symptoms from COVID-19 infection. This factor alone supports a finding of extraordinary and compelling reasons, as numerous courts have held. See, e.g., United States v. Campbell, No. CR03-4020-LTS, 2020 U.S. Dist. LEXIS 112335 (N.D. Iowa June 26, 2020).

b. Hansmeier's Term of Imprisonment Has Been Unusually Harsh.

Courts recognize that the unusually harsh conditions associated with the Bureau of Prisons' COVID-19 modified operations can also support a finding of extraordinary and compelling reasons. See, e.g., United States v. King, No. 17-cr-20332, 2020 U.S. Dist. LEXIS 165451, at *14-16 (E.D. Mich. Sept. 10, 2020). Hansmeier's term of imprisonment has largely coincided with the pandemic and has been associated with lack of access to fresh air and exercise, lack of programming opportunities, inhumane housing---where Hansmeier was unable to protect himself from COVID-19 infection---and the inability to see his two young children. The Court could not have anticipated these conditions when it sentenced Hansmeier to a term of imprisonment and hopefully it would have taken a different view of the suitability of imprisonment versus alternative forms of punishment if it had. See, e.g., United States v. Hatcher, 18-cr-454-10 (KFP) (S.D.N.Y.) (granting motion for compassionate release that the district court had previously denied in light of extraordinarily harsh prison conditions during the COVID-19 global pandemic). A finding of extraordinary and compelling reasons is supported by the fact that many of the deprivations associated with the Bureau of Prisons' modified operations rise to the level of constitutional issues or have otherwise supported findings of extraordinary and compelling reasons. See, e.g., Pierce v. County of Orange, 526 F.3d 1190, 1212 (9th Cir. 2008) (lack of exercise); John Palmer, Constitutional Rights of Prisoners, 10.2 Right to Rehabilitation (9th ed.) (lack of programming); and United States v. Atkinson, No. 2:19-cr-55 JAM(CHI), 2020 WL 1904585, **2-4 (D. Nev. Apr. 17, 2020) (housing).

3. The Government's Constitutional Violations Present Extraordinary and Compelling Reasons.

a. The Government's Resort to Misstatements and Omissions.

The Court's sentence and the Eighth Circuit's affirmance were infected with prosecutors' violations of Hansmeier's constitutional rights. In short, prosecutors convinced the Court and the Eighth Circuit that Hansmeier's copyright enforcement methods were illegitimate, when the reality is that Hansmeier's methods were "routine," according to a leading treatise, and no different than the methods used by copyright holders to enforce their copyrights for the past four decades. Though Hansmeier has filed a motion pursuant to 28 U.S.C. 2255 to address these violations, 18 U.S.C. 3582 presents an independent vehicle for the Court to address prosecutors' misstatements and omissions. The Court should find that prosecutors' resort to misstatements and omissions, including misstatements and omissions that occurred post-sentencing, presents extraordinary and compelling reasons.

b. The Government's Egregious Retaliation Against Hansmeier.

The government's egregious retaliation against Hansmeier on account of his constitutional challenges to the federal mail fraud and wire fraud statutes and the Hobbs Act is an independent reason to find extraordinary and compelling reasons. The government's conduct was a bright-line violation of Hansmeier's First Amendment rights and interfered with active judicial proceedings. Human nature being what it is, government officials have already taken the Court's acceptance of the application of the fraud statutes to litigation conduct and started distorting it in ways that the Court did not appear to anticipate when it denied Hansmeier's motion to dismiss. This motion presents an opportunity for the Court to address unambiguously wrongful actions by the government. The government's egregious retaliation against Hansmeier presents extraordinary and compelling reasons.

4. Other Factors Present Extraordinary and Compelling Reasons.

Other factors present extraordinary and compelling reasons. First, Hansmeier's inability to see his two young children for nearly two years now is a point that the Court should give careful consideration because it harms not only Hansmeier, but his two young children who are now unable to see their father. Unless there is a concrete public interest that is served by Hansmeier's continued imprisonment, Hansmeier asks the Court to view this factor as an extraordinary and compelling reason.

Second, the dangers presented by prosecutors' successful expansion of the fraud statutes to cover not only allegations of fraudulent litigation conduct, but allegations of "routine," but unwanted (to them), litigation conduct, is a circumstance that demands extensive and forceful litigation. Hansmeier is uniquely well suited from a standing perspective to address these

CASE 0:16-cr-00334-JNE-KMM   Doc. 211-1   Filed 01/06/22   Page 15 of 17

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C
----------------------------------------------------------------------------------------------------

dangers, but the reality is that the Bureau of Prisons cannot provide him or any other inmate with anything approaching reasonable access to legal materials during the pandemic. Making matters worse, the Bureau of Prisons' ongoing retaliation against Hansmeier includes continuing interference with Hansmeier's access to the courts. For example, Bureau of Prisons' officials recently blocked Hansmeier's e-mails in which he was seeking a First Amendment attorney, stating that the e-mail posed a threat to institutional security. Officials took similar actions with respect to Hansmeier's e-mails in which he was seeking a copy of Judge Magnuson's practices pointers---these practice pointers, of course, are not a threat to institutional security. Hansmeier asks the Court to view his lack of access to the courts and Bureau of Prisons officials' active interference with Hansmeier's access to the courts as an extraordinary and compelling reason.

Third, the Court should weigh Hansmeier's service to his fellow inmates and society as a large when it considers whether to find extraordinary and compelling reasons. Hansmeier chose to spend his time in prison serving as a GED tutor, when other inmates spend their time getting high, playing cards, gambling and/or watching Ridiculousness.

Fourth, the Court should consider the public interest when it weighs whether to find extraordinary and compelling reasons. The Court needs to push back against prosecutors' standardless criminalization of "routine" litigation methods lest the public be left with the impression that prosecutors can imprison litigants in a manner that is untethered from the rule of law. This factor supports a finding of extraordinary and compelling reasons.

5. The Court May Consider the Foregoing Factors Cumulatively.

Many of the foregoing factors have been relied upon by courts as an independently sufficient ground for granting relief under section 3582. However, the Court may also considering the foregoing factors cumulatively in reaching a finding of extraordinary and compelling reasons. Considered cumulatively, the foregoing factors present an extraordinary and compelling reasons justifying relief under section 3582.

[intentionally left blank]

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C

----------------------------------------------------------------------------------------------------

FROM: 20953041
TO:
SUBJECT: 3582 Motion - 07 - Argument Part 2
DATE: 12/31/2021 06:59:28 AM

    C. Safety Considerations.

Hansmeier's release would not raise any safety concerns. Hansmeier was allowed to remain free on pretrial on a personal recognizance bond and did so without incident. Hansmeier was ordered to self surrender to federal prison and did so without incident. The Court could have sentenced Hansmeier to a term of probation or home confinement and Hansmeier would have served that sentence without incident. Certainly, there is nothing in Hansmeier's background that would suggest that Hansmeier would pose a safety threat.

As a point of comparison, there is nothing that the Court could objectively point to that would suggest that Hansmeier is a greater safety threat than David MacLaughlin, for example. Hansmeier does not say so to be argumentative; rather, as with David MacLaughlin, Hansmeier has zero criminal history other than the charges associated with his current term of imprisonment. While the government claims that Hansmeier committed crimes by making misstatements to courts, there is a very reasonable case to be made that the government's claims are based on a misapprehension of the law of copyright enforcement and it is the government, rather than Hansmeier, that misadvised the courts. Yet, it is doubtful that the Court will lose sleep over the fact that David MacLaughlin is free to run around society (and there is no reason for the Court to lose sleep over David MacLaughlin's freedom because the judicial process is adequate to address allegations of misstatements and other attorney misdeeds---the drawbacks of using imprisonment to address allegations of attorney misconduct far outweigh the benefits).

The Court should not overlook the fact that Hansmeier's alleged crimes all depended on Hansmeier's status as an attorney. Because he is no longer licensed to practice law, it is impossible for Hansmeier to reoffend. Even if this were not true, the Court can see that in his new copyright enforcement actions, Hansmeier is the named plaintiff and that he is disclosing his investigative methods. While Hansmeier would contest the government's assertion that any of this is required by the legal standards governing copyright enforcement actions, he would rather act out of an abundance of caution and proceed in this manner.

The Court should be attentive to the government's response on this point. In Hansmeier's request for release pending appeal, the government claimed that Hansmeier was a threat to public safety based on Hansmeier's representation of people with disabilities in civil rights actions. Not only is this argument specious, but such irresponsible statements add significant burdens to the federal government and private individuals. For example, prosecutors' actions with respect to Hansmeier's civil rights enforcement activity has necessitated constitutional challenges to the laws that prosecutors threatened to enforce against Hansmeier. Chief Judge Tunheim has characterized the very early stages of the litigation associated with these challenges as "sprawling." Prosecutors are complaining that these claims impose an extreme burden on their offices. Private defendants to these claims have described these claims as causing fear and confusion. Bureau of Prisons officials have taken their own actions with respect to these claims. None of these claims or burdens would be necessary if prosecutors would stay in their own lane and let the courts perform their core function of deciding whether a claim has merit.

If prosecutors continue to make specious attempts to link litigation activity with threats to public safety, then Hansmeier respectfully requests that the Court admonish them for doing so, lest its silence encourage more of this wrongful and irresponsible behavior.

    D. The 3553 Factors Favor a Reduction in Sentence.

The Court carefully weighed the 3553 factors when it sentenced Hansmeier. However, the reality of Hansmeier's imprisonment is much harsher than what the Court could have reasonably anticipated at sentencing. No one, including the Court, could have known that there was going to be a global pandemic that would lock down the Bureau of Prisons, or that Hansmeier would be repeatedly infected with a killer disease that would knock him out at least once and threaten him with serious future harm, that the Bureau of Prisons would engage in the harsh and illegal retaliation that it has against Hansmeier, or that Hansmeier's term of imprisonment would be associated with any of the other circumstances that have come to pass.

Moreover, the reality of this case is that, due to the government's misrepresentations and omissions, the Court may have not have fully appreciated that it was sentencing Hansmeier to prison for using a "routine" copyright enforcement method that is being used successfully today. To the extent this is true, then a reevaluation of the 3553 factors may be warranted. If the Court does conduct a reevaluation, then Hansmeier believes it is beyond serious debate that attorneys should not be sent to prison

CASE 0:16-cr-00334-JNE-KMM   Doc. 211-1   Filed 01/06/22   Page 17 of 17

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: SST-K-C
--------------------------------------------------------------------------------

based on allegations that amount to little more than that an attorney engaged in "routine" litigation activity and failed to make disclosures that are not required by the legal standards governing the "routine" litigation activity.

As for the so-called "hacking" claims, the indictment alleges meritless litigation activity, which can be resolved through the judicial process without any of the drawbacks associated with resorting to federal criminal statuates. Indeed, this is what the Eighth Circuit has instructed district courts to do, as Hansmeier's contemporaneously-filed motion under 28 U.S.C. 2255 notes. I.S. Joseph Co. v. Lauritzen, 751 F.2d 265, 267-68 (8th Cir. 1984) ("If a suit is groundless or filed in bad faith, the law of torts may provide a remedy. Resort to a federal criminal statute is unnecessary.").

Leaving this point aside, at this stage there is no mechanism for Hansmeier to challenge the prosecutors' factual assertions regarding the "hacking" claims. As was set forth in Hansmeier's contemporaneously filed motion for relief under 28 U.S.C. 2225, prosecutors' misrepresentations and omissions regarding the copyright enforcement claim made Hansmeier's change of plea a fait accompli because they misled the Court into believing that these "routine" copyright enforcement activities were a sham. Had the Court dismissed the copyright enforcement scheme from the indictment then Hansmeier would have proceeded to trial on the "hacking" scheme. Prosecutors' investigation into the facts surrounding the "hacking" scheme was just as wanting as their research into the law of copyright enforcement. For example, when Hansmeier's attorneys signaled to prosecutors that the "hacking" claims were legitimate, to Hansmeier's knowledge all that prosecutors did was call in Hansmeier's brother, a political science major, and ask him whether he ever saw any hacking at the law firm. This investigation was not probative of Hansmeier's "hacking" claims and did nothing to further prosecutors' understanding of the truth of Hansmeier's "hacking" claims.

For all of the reasons discussed above, Hansmeier believes that the 3553 factors favor a reduction in sentence.

    E. Requested Relief.

Hansmeier respectfully requests a sentence reduction to time served. To the extent that the Court declines to award this relief, then Hansmeier would note that the Court has the power to convert any time taken off Hansmeier's sentence to supervised release or home confinement. In other words, the Court could reduce Hansmeier's sentence to time served and add back whatever number of years of home confinement or supervised release that the Court believes are required by the 3553 factors or any other factors the Court may weigh.

    IV. Conclusion.

    The Court should grant Hansmeier's motion.

Dated: December 31, 2021

Respectfully submitted,

Paul Hansmeier
20953-041 Unit K3
Federal Correctional Institution
P.O. Box 1000
Sandstone, MN 55072

Certification: I certify under the penalty of perjury that the factual assertions in the memorandum of law are true the best of my knowledge, information and belief.

December 31, 2021
Paul Hansmeier